*253 OPINION OF THE COURT
JORDAN, Circuit Judge.
Appellant B.S. (“Mother”) is the natural mother of M.N. (“Daughter”), a minor child. Mother had primary legal custody of Daughter until Daughter was removed from Mother’s care in. accordance with a court order that transferred custody to the child’s natural father, E.N. (“Father”). Mother claims that Somerset County (the “County”), along with Somerset County Children and Youth Services and two of its employees, Julie Barth and Jessica Eller, (collectively, “Appellees”) violated her constitutional rights to substantive and procedural due process in securing and effectuating the transfer and related orders. She seeks to redress those alleged constitutional violations under 42 U.S.C. § 1983, and she is now appealing an order of the United States District Court for the Western District of Pennsylvania that rejected her claims and entered summary judgment in Appellees’ favor.
We agree with Mother that her procedural due process rights were violated by the Appellees, though the individual defendants are protected by absolute immunity. As to the substantive due process claims, we conclude that the District Court’s grant of summary judgment for the Appellees was correct, though for somewhat different reasons than those expressed by that Court. We will therefore affirm in part and reverse in part the District Court’s order and will remand the case for a trial against the County on the damages Mother sustained when her procedural due process rights were violated.
I. Background[1]
Daughter was born in June 2004 and suffered a variety of medical problems that stunted her growth. In October 2005, Mother took Daughter to a pediatric gas-troenterologist named Dr. Douglas Lind-blad, who diagnosed Daughter with failure to thrive.[2] After running various tests to determine the cause of her condition, Dr. Lindblad referred Daughter for inpatient treatment at the Children’s Institute of Pittsburgh (the “Children’s Institute”).
She was treated there from March 20, 2006 to March 26, 2006, and gained 50 grams per day during that time. That weight gain was normal for a child of Daughter’s age in Daughter’s condition, reflecting what “[she] would have been expected to gain plus additional weight which would get ... [her] to the point ... where [she] should [have] be[en] in terms of growth.” (Joint App. at 668; see id. at 669.) Daughter had not experienced normal growth before that time, having previously gained only 8 to 11 grams per day. Sadly, after concluding her inpatient treatment and returning to Mother’s care, Daughter gained only 4 grams per day, at least initially.
A. Dr. Lindblad’s Child Abuse Report
The “fact that [Daughter’s] weight gain when she was an inpatient ... far exceeded her rate of weight gain at home” concerned Dr. Lindblad (id. at 139), and led him to attribute Daughter’s failure to thrive to how Mother was caring for her. *254 Specifically, after examining Daughter on April 18, 2006, Dr. Lindblad concluded that Daughter’s failure to thrive was psychosocial, as opposed to physical, in origin. Psychosocial failure to thrive occurs when a “child’s failure to thrive is due to some factors in the home that lead the child not to grow well,” and is “usually associated with inadequate caloric intake.” (Id. at 670.) Although psychosocial failure to thrive is not necessarily associated with neglect, Dr. Lindblad feared that Daughter was being neglected by Mother, and he further opined in his progress notes that he was “concerned about Munchausen by proxy.”[3] (Id. at 433.)
As a result, Dr. Lindblad believed Daughter was in physical danger that justified reporting to state authorities his fear that Mother was neglecting Daughter, or worse. But while Dr. Lindblad believed that action was warranted after seeing Daughter on April 18, 2006, he did not immediately make a report to “ChildLine,” the Pennsylvania state entity responsible for receiving reports of neglect and abuse.[4] Instead, his first contact with state authorities about Daughter’s case occurred on May 4, 2006, when he spoke with Jessica Eller. Eller, a child welfare caseworker for Somerset County Children and Youth Services,[5] was already investigating Daughter’s case and had previously contacted Dr. Lindblad in connection with her investigation.[6]
Dr. Lindblad told Eller of the discrepancy between Daughter’s inpatient weight gain and her weight gain when under *255 Mother’s care, explained his conclusion that Daughter’s failure to thrive was psychosocial in origin, and described his concern about Munchausen by proxy. During that conversation, Eller “instructed Dr. Lindblad to [file] a ChildLine report” (id. at 311), which he did shortly thereafter.
B. Eller’s Child Abuse Report
At some point, Eller also made her own ChildLine report.[7] A description of Eller’s ChildLine report stated that she had opted to make the report after speaking with a referral source and consulting her supervisor, Julie Barth, and the report relayed much of the information Dr. Lindblad had told Eller.[8] After making her initial Child-Line report, Eller prepared a summary of her findings in Daughter’s case to present to a judge for the purpose of removing Daughter from Mother’s home. Her summary, dated May 5, 2006, stated:
[The County] received a referral on May 5, 2006 alleging serious physical neglect of [Daughter] by ... [Mother].... Childline [sic] contacted [the County] and an investigation has been initiated. Allegations of the neglect are psychosocial failure to thrive. [Daughter] is nearly 2 years old and is currently 19 pounds. She was gaining 8 — 10 grams of weight per day while being fed by her mother, until she entered the Children’s Institute due to concerns of low weight on March 20, 2006. While at the Children’s Institute, [Daughter] gained 50 grams of weight per day while still being fed by her mother under the supervision of the Institute staff. Since her discharge on March 26, 2006 [Daughter] is now gaining 4-5 grams of weight per day.
[The County] believes that it would be contrary to the welfare of the child ... to continue to reside with and have unsupervised contact with ... [Mother] until the outcome of the investigation is determined. Therefore, the Agency is requesting that all visitation and contact between [Mother] and [Daughter] [be] supervised by the Agency pending the outcome of the investigation.
(Joint App. at 467.) Eller also prepared a corresponding court order to suspend Mother’s contact with Daughter and transfer the child to Father’s custody.[9]
According to Appellees, the information relayed in Eller’s summary “was based upon [a] good faith recall and reading of’ Daughter’s medical records. (Id. at 380.) However, the summary’s reference to Daughter’s weight being 19 pounds was mistaken, in light of her most recent weigh-ins.[10] Whether Eller was aware of any error in the summary is a matter of dispute, but, in any event, she took her prepared summary and court order to Judge Cascio of the Court of Common *256 Pleas of Somerset County, and presented them to him ex parte on May 5, 2006. Judge Cascio reviewed Eller’s summary, and signed the proposed order, which provided as follows:
[D]ue to allegations of serious physical neglect which are under investigation by [the County], it is hereby ordered that all contact and visitation between ... [Daughter] and ... [Mother] ... be supervised by [the County] pending the outcome of the investigation. It is also ordered that [Daughter] shall reside with ... [Father] ... until the completion of the investigation and [Mother] shall conduct herself appropriately in all visitations with [Daughter], including no badgering or harassing the agency staff, belittleling [sic] any service providers or ... [Father].
(Id. at 468.) Judge Caseio’s order and Eller’s summary were each filed under case number 20-B Juvenile 2006.
C. Daughter’s Removal from Mother’s Home
Armed with Judge Cascio’s order, Eller, along with a police officer, went to Mother’s home that same day and took Daughter from Mother. Pennsylvania’s Child Protective Services Law (the “CPSL”) ordinarily requires that a follow-up hearing be held within 72 hours of a child’s removal from a parent’s custody.[11] According to Appellees, however, they were not required to schedule such a hearing because, although Daughter was removed from Mother, she was transferred to Father’s custody and not to the state’s custody. Indeed, as Eller explained it, although a post-removal hearing would normally be required within 72 hours after executing an order taking a child into the state’s custody, no hearing is required to comply with state law if the County merely “transfers custody” to another parent, because the County would not have “take[n] custody.” (Joint App. at 292.)
That view was also expressed by Natalie Hunt, the Assistant Director of Somerset County Children and Youth Services. Explaining that the kind of transfer in custody that occurred in this case is employed when there is a fit parent who can take custody of the child, Hunt testified that “the 72-hour-hearing requirement is [not] necessary” unless the County files a dependency petition to take custody of a minor. (Id. at 331.) Caseworker supervisor, Douglas Walters, echoed Hunt’s testimony, stating that, for as long as he could remember, the County would simply contact a judge when it felt it “needed to get an order, obtain an order to stop contact until [the County] could investigate” (id. at 339-40), and that, in such circumstances, the “agency doesn’t schedule a hearing” (id. at 342).[12] He said that, on average, the County asks a judge to restrict contact *257 between a parent and a child in that manner five to ten times per year.
Thus, because Appellees thought it unnecessary to hold the hearing that Pennsylvania law would require were Daughter taken into state custody, no follow-up hearing was scheduled and Mother received no explanation of how to arrange for a hearing. Instead, Eller simply presented Mother with Judge Cascio’s order and left with Daughter.
D. Daughter’s Subsequent Weigh-Ins and Eller’s Investigation
Immediately after picking Daughter up on May 5th, Eller took her to a pediatrician at what the parties refer to as “Berlin Pediatrics.”[13] During that visit, Daughter’s weight was recorded as being 22 pounds, 2 ounces. Daughter returned to Berlin Pediatrics with Father three days later, on May 8, 2006, and her weight was again recorded as 22 pounds, 2 ounces. The results of those two weigh-ins are highly significant because, as Dr. Lindblad explained during his deposition, they placed Daughter around the fifth percentile on the growth chart and would “not support a diagnosis of failure to thrive,” if the trend in growth they showed were to continue.[14] (Id. at 366-67.) It did not. When Daughter was weighed at Berlin Pediatrics on May 16, 2006, she was 20 pounds, 11 ounces.
Eller, in the meantime, continued investigating Mother. The result of her investigation was a June 19, 2006 Child Protective Services Investigation report that found the allegations of neglect against Mother to be supported by substantial evidence.[15] Eller’s conclusion was based on her finding that Daughter had gained only 4 to 5 grams of weight per day while under Mother’s care following her discharge from inpatient treatment, compared to the 50 grams per day she gained while at the Children’s Institute and to the average of 40.5 grams per day she gained from May 16, 2006 to May 30, 2006, while under Father’s care.
Those findings were misleading, however, because they implied that Daughter’s first weigh-in under Father’s care occurred on May 16, 2006 and that Daughter weighed only 19 pounds, 10 ounces when *258 she was initially placed in Father’s care on May 5, 2006.[16] Eller’s report did not mention Daughter’s May 5 and May 8, 2006 weigh-ins at Berlin Pediatrics, because El-ler treated them as invalid measurements. She asserted that those weights are unreliable because Daughter had been dressed when they were taken.[17] By ignoring those data points, Eller was not forced to consider that Daughter may have gained significant weight while under Mother’s care before Daughter was removed on May 5, 2006, and that Daughter’s weight seemed to drop when she was first placed with Father.
E. Mother’s Habeas Corpus Petition, and Judge Cascio’s Orders in Connection With Eller’s Report
Before Eller’s June 19, 2006 Child Protective Services Investigation report was submitted to the state, Mother filed a ha-beas corpus petition in the Court of Common Pleas of Somerset County, arguing that the County had violated state law by not providing a hearing after removing Daughter from Mother’s custody. Mother’s petition was filed under the same case number as the May 5, 2006 order removing Daughter from Mother’s custody, and a hearing was held before Judge Cascio on June 14, 2006. At the hearing, which occurred 40 days after Daughter was removed from Mother’s custody, the County contested Mother’s petition by arguing that it had no obligation to conduct a post-removal hearing because it had not taken custody of Daughter. The hearing concluded with Judge Cascio’s taking Mother’s petition under advisement.
Eller, as noted, completed and filed her Child Protective Services Investigation report five days later, on June 19, 2006.[18] Four days after that, on June 23, 2006, she met ex parte with Judge Cascio to present another summary to him that relayed her findings. It stated:
[The County] has completed the Child Protective Services investigation regarding serious physical neglect of [Daughter], The [report] was filed on June 19, 2006 with Childline and substantiated [Mother] ... as the perpetrator. Due to the indicated status of the report [the County] is recommending that visits continue to be supervised between [Mother] and [Daughter] until further hearings on this matter are scheduled by either parent.
*259 (Id. at 712.) As she had done before, Eller offered a proposed order to Judge Cascio, along with her summary. After that meeting, the Judge entered the following order which, with Eller’s summary, was filed on June 23, 2006 under the same case number as Mother’s habeas petition and the initial removal order had been:
[D]ue to the indicated report of serious physical neglect whereby [Mother] is the perpetrator, it is hereby ordered that all visitation between [Mother] and [Daughter] continue to be supervised until further hearings on this matter are scheduled by either parent.
(Id. at 713.)
A few days later, on June 26, 2006, Judge Cascio entered an order denying Mother’s habeas corpus petition saying, among other things, that “[t]he child was not taken into protective custody so as to trigger the provisions and protections of the” CPSL; and that “[placement of the child with her Father is necessary and appropriate considering the serious and continuing medical evidence of failure of the child to thrive while in Mother’s care.” (Id. at 714-15.)
Mother and Father subsequently embarked upon contentious custody proceedings, eventually receiving shared custody of Daughter.
F. Procedural History
On February 5, 2008, Mother initiated this lawsuit. She later filed an amended complaint asserting claims against Appel-lees for violating her substantive due process rights, as well as claims for violating her right to procedural due process by transferring Daughter to Father’s custody without timely notice or an opportunity to be heard.[19] After the completion of discovery, Appellees filed a motion for summary judgment. Mother opposed that motion and moved for summary judgment on her procedural due process claim. Holding that the individual defendants were shielded by absolute or qualified immunity and that the County’s actions did not violate Mother’s constitutional rights, the District Court granted Appellees’ motion and denied Mother’s. It entered judgment in Appellees’ favor the same day.
This timely appeal followed.
II. Jurisdiction and Standard of Review
Because Mother challenges the process she received with respect to state court orders issued by Judge Cascio, we asked the parties to prepare letter-briefs on whether the Rooker-Feldman doctrine affects our subject matter jurisdiction in this case. See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (explaining that “federal courts of first instance” lack jurisdiction to “review and reverse unfavorable state-court judgments” (citing Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); D.C. Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983))). Appellees responded by arguing that the Rooker-Feldman doctrine bars Mother’s constitutional claims. Mother, of course, argues that the doctrine “has absolutely no application” to any of her claims. (Appellant’s Letter Mem. at 1.)
In Great Western Mining & Mineral Company v. Fox Rothschild LLP, 615 F.3d 159 (3d Cir.2010), we surveyed recent caselaw and concluded that “there are four *260 requirements that must be met for the Rooker-Feldman doctrine to apply,” id. at 166, namely that “(1) the federal plaintiff lost in state court; (2) the plaintiff complaints] of injuries caused by [the] state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments,” id. (alterations in original) (citation and internal quotation marks omitted). We concluded that a federal claim alleging that the defendants conspired to engineer the plaintiffs loss in state court proceedings was not barred by Rooker-Feldman because it did not “assert injury caused by state-court judgments and seek review and rejection of those judgments[.]” Id. at 171. Because the injury Mother claims is likewise traceable to Appellees’ actions, as opposed to the state court orders those actions allegedly caused, we reject Appellees’ contention that the Rook-er-Feldman doctrine precludes federal subject matter jurisdiction in this case. Cf. id. at 166-67 (a father’s suit “for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent” is barred by Rooker-Feldman (quoting Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 87 (2d Cir.2005))).
Having rejected Appellees’ invocation of the Rooker-Feldman doctrine, it is clear that the District Court had jurisdiction under 28 U.S.C. § 1331. We, in turn, have jurisdiction under 28 U.S.C. § 1291, and exercise “plenary review of [the] district court’s grant of summary judgment.” Funk v. CIGNA Grp. Ins., 648 F.3d 182, 190 (3d Cir.2011). Accordingly, we view the facts in Mother’s favor to determine whether the District Court correctly held that “there [was] no genuine dispute as to any material fact and [that Appellees were] entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). Because Mother challenges the District Court’s decision to deny her summary judgment on her procedural due process claim, we must also view the facts in the light most favorable to Appellees to determine whether the District Court correctly determined that Mother was not entitled to summary judgment on that claim.
III. Discussion
The Fourteenth Amendment’s Due Process Clause prohibits states from “depriving] any person of life, liberty, or property, without due process of law,” U.S. Const, amend. XIV. “As [the] concept [of due process] has developed, it has come to have both substantive and procedural components.” Evans v. Sec’y Pa. Dep’t of Corr., 645 F.3d 650, 658 (3d Cir.2011). Mother contends that Appellees violated both components when they removed Daughter from her home and transferred the child to Father’s custody, and she thus seeks redress pursuant to 42 U.S.C. § 1983.[20] According to Mother, the District Court erred by entering judgment in Appellees’ favor on the substantive due process claim, and by failing to enter a judgment recognizing that Appellees violated her procedural due process rights. She asks, therefore, that we vacate the District Court’s order and remand the case for entry of judgment on her procedural due process claim, and for a trial on her substantive due process claim and on the damages attendant to her procedural due process claim.
*261 Appellees respond that the District Court appropriately entered judgment in their favor because their actions did not violate Mother’s due process rights. They further contend that, in any event, Eller and Barth cannot be liable because they are entitled to absolute or qualified immunity for all claims against them. In addition, although Appellees have not pressed the issue in their briefing before us, they argued to the District Court that the County cannot be liable because it is a municipal entity and not culpable for the acts of its agents, and, if true, that would be a basis for affirming the District Court’s judgment as to the claims against the County.[21] Cf. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282 (3d Cir.2012) (“[W]e can affirm based on any grounds supported by the record.”). We consider first whether Eller and Barth are liable to Mother for any procedural or substantive due process violations, and then we address the County’s liability for those claims.
A. Due Process Claims Against Eller and Barth
1. Absolute Immunity in the Child Welfare Context[22]
Although the Supreme Court has made clear that “[m]ost public officials are enti-tied only to qualified immunity,” it has recognized that “public officials who perform ‘special functions,’ ” such as prosecutors, are sometimes entitled to absolute immunity. Yarris v. Cnty. of Del., 465 F.3d 129, 135 (3d Cir.2006) (quoting Butz v. Economou, 438 U.S. 478, 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). The purpose of according absolute immunity to such officials is to ensure that they “can perform their respective functions without harassment or intimidation.” Butz, 438 U.S. at 512, 98 S.Ct. 2894. Although conferring absolute immunity obliges courts to sometimes deny relief to those “with valid claims against dishonest or malicious government officials,” Snell v. Tunnell, 920 F.2d 673, 687 (10th Cir.1990), the underlying logic is that it is ultimately “better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation,” Yarris, 465 F.3d at 135 (citation and internal quotation marks omitted).
Still, absolute immunity is “strong medicine, justified only when the danger of [officials’ being] deflect[ed from the effective performance of their duties] is very *262 great.” Forrester v. White, 484 U.S. 219, 230, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (alterations in original) (citation and internal quotation marks omitted). Moreover, officials who “seek exemption from personal liability” on that basis bear “the burden of showing that such an exemption is justified by overriding considerations of public policy.” Id. at 224, 108 S.Ct. 538. Thus, “[i]n light of the Supreme Court’s ‘quite sparing’ recognition of absolute immunity ..., we begin with [a] presumption that qualified rather than absolute immunity is appropriate,” unless the official invoking absolute immunity meets a “heavy burden of establishing entitlement” to it. Odd v. Malone, 538 F.3d 202, 207-08 (3d Cir.2008) (citation omitted).
Appellees contend that they have met that burden here because Eller and Barth performed “actions ... closely analogous to those of prosecutors.” (Appellees’ Br. at 39.) As Appellees correctly point out, we have recognized that the justifications for according absolute immunity to prosecutors sometimes apply to child welfare employees. Specifically, in Ernst v. Child & Youth Services of Chester County, 108 F.3d 486 (3d Cir.1997), we joined several of our sister circuits in deeming “child welfare workers and attorneys who prosecute dependency proceedings on behalf of the state ... absolutely] immunje] from suit for all of their actions in preparing for and prosecuting such dependency proceedings.” Id. at 488-89. The plaintiff in that case was the grandmother of a minor child for whom she was the sole legal guardian. Id. at 489. After receiving a report that the child had an extreme and unhealthy attachment to the grandmother, an employee of a state child welfare agency initiated emergency dependency proceedings to remove the child from the grandmother’s custody and commit her to the custody of the state. Id. An immediate detention hearing was held, at which a state judge ordered that the child be placed in a psychiatric institution for a complete evaluation. Id. The state child welfare agency assumed custody of the child, and a legal battle between the agency and the plaintiff ensued. Id.
The plaintiff eventually filed suit under § 1983 alleging, inter alia, due process claims against various agency caseworkers and a private attorney who had represented the agency throughout the dependency proceedings. On appeal, we considered whether those defendants were “entitled to absolute immunity for their actions in petitioning and in formulating and making recommendations to the state court.” Id. at 493. We began our analysis by noting that § 1983 “did not abolish long-standing common law immunities from civil suits,” id., including those against individuals who hold offices that did not exist at common law but who perform tasks “analogous to functions performed by those who were immune at common law,” id. at 494. Drawing on the Supreme Court’s extension of absolute immunity to prosecutors, we held that absolute immunity cloaked state child welfare caseworkers from liability with respect to “their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings.” Id. at 495. We clarified that such immunity was broad enough “to include the formulation and presentation of recommendations to the court in the course of such proceedings” id., but we also said that “we would be unwilling to accord absolute immunity to ‘investigative or administrative’ actions taken ... outside the context of a judicial proceeding,” id. at 497 n. 7.
Our holding, as we explained it, was premised on three parallels between child welfare employees and prosecutors:
(1) the functions performed by [state child welfare caseworkers] in dependen *263 cy proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers.
Id. at 495. As to the first point, we observed that, like prosecutors, “social worker[s] must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children.” Id. at 496 (quoting Meyers v. Contra Costa Cnty. Dep’t of Soc. Servs., 812 F.2d 1154, 1157 (9th Cir.1987) (internal quotation marks omitted)). Regarding the applicable public policy considerations, we noted that, much like prosecutors, child welfare workers “acting in a quasi-prosecutorial capacity in dependency proceedings” are forced to “exercise independent judgment” that should not be compromised by exposing them to the potentially chilling effect of § 1983 liability. Id. at 496. Finally, we gave two reasons why § 1983 liability was not the only mechanism available to protect the public against unconstitutional conduct:
First, the judicial process itself provides significant protection. Child welfare workers must seek an adjudication of dependency from a neutral judge whose decisions are guided by the “best interests of the child” and subject to appellate review. Second, although child welfare workers are not subject to the comprehensive system of professional responsibility applicable to prosecutors, they are under the supervision of the agency that employs them. The agency has an incentive to ensure that its employees do not violate constitutional rights because it is not immune from suit for abuses committed by employees with policy-making authority or acting pursuant to agency policy or custom.
Id. at 497 (citation omitted). Because the plaintiffs claims against the state child welfare workers arose “in connection with the formulation and presentation of recommendations to the state court regarding [the child’s] dependency status and disposition,” we deemed those workers entitled to absolute immunity. Id.
We likewise extended that immunity to the private attorney who had represented the agency, because the attorney had — like the agency’s employees — taken action “on behalf of the State that [was] integrally related to the judicial process.” Id. at 502; see also id. at 504. Notably, we did so even though the attorney’s allegedly unlawful actions occurred after the attorney had been ordered removed from serving on the agency’s behalf and had been undertaken with a subjectively malicious intent. Id. at 503; see also id. (“It is true that Ernst alleged, and the court found, that [the attorney] ... filed this petition because of hostility to Ernst rather than for the purpose of serving the best interest of [the child].”). Reasoning that the immunity analysis was to be undertaken “without reference to the official’s subjective state of mind,” id. at 502, we concluded that absolute immunity could protect the attorney from liability flowing from prosecutorial actions, as long as the challenged acts were not those that “a reasonable [person] would recognize as being clearly outside his jurisdiction,” id. at 502 (citation and internal quotation marks omitted). Because “a reasonable attorney in [the attorney]’s position could have concluded that she owed a duty to her client,” since a new lawyer had not been appointed to replace her at the time of the challenged *264 conduct, we held that she “did not act in a clear absence of authority” and was therefore entitled to absolute immunity. Id. at 504.
Appellees claim that the requests for orders pertaining to Mother’s custodial rights are entitled to absolute immunity under Ernst because they constitute protected advocacy. (See Appellees’ Br. at 42 (“Requesting ... an order is ‘petitioning’ the court, and providing any testimony constitutes ‘making recommendations to the state court’ and/or ‘acting as an advocate in judicial proceedings’.... ”).) The District Court accepted that argument, understanding our precedent in Ernst to mean that “there must be a judicial court order before ... social workers ... [may] receive absolute immunity.” (Joint App. at 24.) The District Court was satisfied that, in this case, that prerequisite was effectively satisfied because “the acts [El-ler and Barth] performed in seeking a judicial order transferring custody from the Natural Mother to the Natural Father were closely associated with the judicial process.” (Id. at 25.)
Mother argues that the District Court ignored that, in this case, unlike in Ernst, dependency proceedings were never initiated; the County instead requested that the Court issue an order in response to a caseworker’s summary[23] and, in so doing, avoided affording Mother automatic process under state law.[24] Thus, she argues, the checks on unconstitutional conduct that were part of the justification for extending absolute immunity in that case simply do not exist here. See Ernst, 108 F.3d at 497 (“Finally, as with prosecutors, there are alternative mechanisms other than the threat of § 1983 liability that protect the public against unconstitutional conduct by child welfare workers.”).
That argument is not without logical force. The availability of “alternatives to damages suits against the official as [a] means of redressing wrongful conduct” is a factor that we must consider when assessing whether a government official is entitled to absolute immunity. Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir.1992); see id. (“Three factors determine whether a government official should be given absolute immunity for a particular function: 1) whether there is a historical or common law basis for the immunity in question; 2) whether performance of the function poses a risk of harassment or vexatious litigation against the official; and 3) whether there exist alternatives to damage suits against the official as means of redressing wrongful conduct.” (citation and internal quotation marks omitted)); cf. Butz, 438 U.S. at 512, 98 S.Ct. 2894 (“Because the[ ] features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.”).
Ultimately, however, Mother’s contention is overstated. As a careful comparison of this case to Ernst reveals, the same sorts of protection we identified there actually do apply here with respect to the caseworkers’ function of seeking judicial orders related to custody of Daughter. *265 First, as is true of dependency proceedings, “the judicial process itself’ provided some check against wrongful conduct under the procedure the County employed in removing Daughter from Mother’s home. Ernst, 108 F.3d at 497. Although the County’s protocol did not include the post-removal hearing that dependency proceedings include, Daughter’s removal was nevertheless effectuated only after Eller presented her findings to “a neutral judge whose decisions [were] guided by [Daughter’s] best interests.” Id. (internal quotation marks omitted). Second, even without following the protocols for removing a child in dependency proceedings, the agency in this case had the incentive we described in Ernst “to ensure that its employees do not violate constitutional rights because it is not immune from suit for abuses committed by employees with policy-making authority or acting pursuant to agency policy or custom.” Id. Thus, although Ernst is certainly distinguishable in that absolute immunity was available to child welfare workers “for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings,” id. at 495 (emphasis added), that distinction is not dispositive as far as the availability of “important safeguards that protect citizens from unconstitutional actions” goes. Id.
Nor is Mother’s argument persuasive as to the “functions performed” or the “public policy considerations” we identified in Ernst. Id. Like caseworkers who present their findings during dependency proceedings, the caseworkers here were forced to act quickly to protect a child from perceived neglect or abuse and had to exercise independent judgment in doing so. See id. at 496-97. After speaking with Dr. Lindblad, Eller discussed the matter with Barth and decided it was necessary to initiate a ChildLine report so as to “report allegations of serious physical neglect” (Joint App. at 463), that would enable her to promptly secure a court order to have Daughter removed from Mother’s care and to protect Daughter from further abuse. The specter of § 1983 liability in future cases could well impede the ability of Eller and others in her position to take action in an emergency. We therefore believe that Ernst’s absolute immunity for child welfare employees is appropriate when the employee in question “formulat[es] and presents] ... recommendations to the court” with respect to a child’s custody determination, even if those recommendations are made outside the context of a dependency proceeding.[25] Ernst, 108 F.3d at 495.
Having determined that the absence of dependency proceedings is not, in itself, a basis for resolving the absolute immunity question, we must now consider whether Eller and Barth were, in fact, formulating and presenting recommendations to a court when they undertook the conduct of which Mother complains. In other words, we need to ascertain whether Eller and Barth “function[ed] as the state’s advocate when performing the action(s)” that gave rise to the due process violations Mother seeks to redress, or whether those claims instead arose from unprotected “administrative or investigatory actions.” Odd, 538 F.3d at 208; see Ernst, 108 F.3d at 495, 497 n. 7 (noting immunity for caseworkers *266 includes “the formulation and presentation of recommendations to the court” but that we would not “accord absolute immunity to ‘investigative or administrative’ actions taken ... outside the context of a judicial proceeding”). The question is “what function ... th[eir] act[s] served,” Schneyder v. Smith, 653 F.3d 313, 332 (3d Cir.2011). We address that question first with regard to the acts underlying the alleged procedural due process violations, and then turn to the substantive due process claims.
2. Procedural Due Process
The procedural due process claims arose when Eller and Barth, with the County’s approbation, removed Daughter from Mother’s custody by presenting ex parte conclusions about Daughter’s welfare to Judge Cascio on May 5, 2006, and perpetuated that removal through a second ex parte meeting on June 23, 2006.[26] In each of those meetings, Eller, on behalf of the County and under Barth’s supervision, recommended that the court issue an order depriving Mother of custody of Daughter. Such actions are “intimately associated with the judicial process in much the same way as are a prosecutor’s actions in representing the state in criminal prosecutions.” Ernst, 108 F.3d at 496 (internal quotation marks omitted). Inasmuch as their acts were fundamentally prosecutorial, in the manner described in Ernst, we conclude that Eller and Barth are absolutely immune from liability with respect to the procedural due process claims.[27] See id. at 495 (according immunity for “the formulation and presentation of recommendations to the court”).
3. The Substantive Due Process Claim
That, however, does not definitively settle the absolute immunity question in this case, because the substantive due process claim with respect to Eller remains to be *267 addressed.[28] Mother contends that that claim arose when Eller removed Daughter on May 5, 2006, based on misrepresented medical evidence (see Appellant’s Opening Br. at 52 (arguing that Eller “coneoct[ed] facts to convince Judge Cascio that he should permit the separation of Daughter from Mother coupled with the absence of information, which would justify removal”)), and when Eller subsequently “manip-ulat[ed] [the] evidence associated with the ChildLine report investigation” and presented that report’s conclusions to Judge Cascio on June 23, 2006, as the basis for her recommendation that Mother not regain custody of Daughter (id.). As the immunity analysis hinges on the specific function served by Eller’s actions, we address each of those actions in turn.
a. Daughter’s Initial Removal
Mother contends that Eller’s initial removal of Daughter on May 5, 2006 constitutes a substantive due process violation because Eller improperly relied on a report from Dr. Lindblad and misrepresented Daughter’s weight on the summary she prepared for Judge Cascio. That claim presents a difficult immunity issue. Although Eller eventually presented her recommendations to a court, and is entitled to absolute immunity for that under Ernst, her solicitation of information from Dr. Lindblad and the compilation of her findings into an abuse report occurred prior to the initiation of judicial proceedings. See Ernst, 108 F.3d at 497 (holding that “formulation and presentation of recommendations to the state” is entitled to absolute immunity, but declining to accord immunity to “investigative or administrative” actions (citation omitted)). Mother’s claim thus raises the question of precisely where to draw the line between a child welfare employee’s investigative and prosecutorial functions, an issue that is not clearly addressed by our holding in Ernst.
But we do not need to answer that question today because, even if we were to conclude that Eller was not entitled to absolute immunity, no rational jury could find that her initial removal of Daughter violated Mother’s substantive due process rights. In Miller v. City of Philadelphia, 174 F.3d 368 (3d Cir.1999), we held that a substantive due process claim requires “decision-making by a social worker that is so clearly arbitrary ... [that it] can properly be said to ‘shock the conscience.’ ” Id. at 376; see also Croft v. Westmoreland Cnty. Children & Youth Servs., 103 F.3d 1123, 1124-26 (3d Cir.1997). In so holding, we observed that “[t]he exact degree of wrongfulness necessary to reach the ‘conscience-shocking’ level depends upon the circumstances of a particular case,” because a “higher fault standard is proper when a government official is acting in *268 stantaneously and making pressured decisions without the ability to fully consider their risks.” Miller, 174 F.3d at 375. In such situations, the “standard of culpability” necessary for a child welfare employee’s actions to shock the conscience must generally “exceed both negligence and deliberate indifference.” Id.
Eller’s actions on May 5 may not be free from fault, but they cannot be said to shock the conscience. When Eller removed Daughter on May 5, she acted quickly upon information from a physician who had been treating Daughter over the course of several months. Dr. Lindblad told Eller of medical evidence that indicated serious neglect. Although he had not seen Daughter for approximately two-and-a-half weeks, Dr. Lindblad knew enough about her case to cogently describe the discrepancy between her growth during her inpatient care at the Children’s Institute as compared with her growth under Mother’s care. Based on Eller’s discussion with Dr. Lindblad, it was reasonable to take the steps she did to protect Daughter from Mother until there had been time to investigate further. Considered in that context, Eller’s misstatement that Daughter weighed 19 pounds, see supra note 16 and accompanying text, cannot be viewed as more than mere negligence, especially because the material facts relayed by Dr. Lindblad that led Eller to act were all accurately stated in her summary to Judge Cascio. We conclude, therefore, that no rational jury could find that Eller’s actions leading to the May 5 removal of Daughter infringed upon Mother’s substantive due process rights.
b. Eller’s Subsequent Actions
Mother next argues that the way Eller handled her subsequent investigation and report could support a jury verdict in Mother’s favor on the substantive due process claim. Specifically, Mother argues that Eller excluded from her analysis the May 5 and May 8 weigh-ins, which suggested that Daughter had improved under Mother’s care. According to Mother, that omission demonstrates that Eller acted either with a desire to manipulate the evidence or with deliberate indifference to the truth, either of which would be sufficient to support a jury verdict in her favor on the substantive due process claim.
To resolve whether Eller is absolutely immune from liability with respect to that claim, we turn to the question of “what function (prosecutorial, administrative, investigative, or something else entirely)” the acts of preparing the report and presenting its conclusion to Judge Cascio served.[29] Schneyder, 653 F.3d at 332. That mode of analysis does not lend itself to easy resolution in this ease. Although Eller “presented]” her “formulated]” conclusions to Judge Cascio, which could entitle her to absolute immunity, Ernst, 108 F.3d at 495, the conclusions she reported were derived from the abuse report she prepared for the state which, on its own, plainly would not, see id. at 497 n. 7 (“[W]e would be unwilling to accord absolute immunity to investigative ... ac *269 tions taken ... outside the context of a judicial proceeding” (emphases added) (internal quotation marks omitted)). There would, in fact, be no serious basis for Eller to posit that she acted as a quasi-prosecutor had she never secured a temporary removal order from Judge Cascio or presented her report’s conclusions to Judge Cascio after filing the report with the state, because her function in investigating potential child abuse and preparing a report required under state law does not approximate legal advocacy. See Holloway v. Brush, 220 F.3d 767, 775 (6th Cir.2000) (“[S]ocial workers are absolutely immune only when they are acting in their capacity as legal advocates — initiating court actions or testifying under oath — not when they are performing administrative, investigative, or other functions.”).
But the presence of an investigative component to Eller’s conduct does not bar the application of absolute immunity when the function of her actions is still fundamentally prosecutorial in nature. In Ernst, we noted that “[t]he Supreme Court has explicitly rejected the idea that absolute prosecutorial immunity extends only to the act of initiation itself and to conduct occurring in the courtroom.” Ernst, 108 F.3d at 497 (citation and internal quotation marks omitted). Rather, absolute immunity can protect acts undertaken “in preparation] for the initiation of judicial proceedings,” so long as they fall within a prosecutor’s “role as an advocate for the state.” Id. at 497-98 (citation omitted). Extending that reasoning to apply to child welfare employees, we concluded in Ernst that absolute immunity protects not only caseworkers’ presentations of their recommendations to a court, but also their “gathering and evaluation of information” to formulate those recommendations and to prepare for judicial proceedings. Id. at 498. To hold otherwise, we explained, would expose caseworkers to liability “for the observations and judgments that were the necessary predicate” for their protected recommendations, which would “eviscerate the immunity they did receive and undermine the purposes sought to be advanced by the grant of absolute immunity.” Id.
Here, the further investigation that El-ler undertook after Judge Cascio’s initial order, and the subsequent ChildLine report that Eller filed, were part of an ongoing judicial proceeding throughout which she served as an advocate for the state. As described above, see supra Part III.A.2, Eller assumed a fundamentally prosecutorial role during the May 5 hearing, arguing on behalf of the County for Daughter’s removal from Mother’s care. Following that initial removal, Eller undertook her investigation with the understanding that her conclusions would be considered in a subsequent custody determination. Judge Cascio’s May 5 order placed Daughter in Father’s custody only “until the completion of the investigation,” indicating that a second determination would be made “pending [its] result.” (Joint App. at 468.) During the June 23 hearing, when that second determination was made, Eller again represented the County in recommending that the temporary change of custody be made permanent. Her investigation was thus conducted in the context of an open judicial proceeding, throughout which her overall role was analogous to that of a prosecutor. See Ernst, 108 F.3d at 496 (establishing that caseworkers’ actions are protected to the extent that they are “intimately associated with the judicial process in much the same way as are a prosecutor’s actions in representing the state in criminal prosecutions” (internal quotation marks omitted)).
*270 In addition to serving in a prosecutorial capacity, Eller’s specific actions were akin to a prosecutor’s preparations for trial. Cf. Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (“[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.”). During her investigation, Eller was “gathering and evaluating] information” in preparation for an upcoming judicial proceeding, see Ernst at 498 (extending absolute immunity to such preparations), and the observations and judgments compiled in her ChildLine report served as the basis for her recommendations to Judge Cascio on June 23, 2006. In Ernst, we expressed concern that excluding such “observations and judgments” from immunity when they form the “necessary predicate” for protected recommendations would “undermine the purposes sought to be advanced by the grant of absolute immunity.” Id. That concern is similarly implicated here. If we protect Eller when she presents her recommendations to a judge, but allow her to be sued for preparing the report that she intends to present, absolute immunity has offered her no real protection; she will still have to defend in court the basis for her decision to recommend removal. Cf. Yanis, 465 F.3d at 135 (concluding that it is “better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation” (citation and internal quotation marks omitted)).
We therefore conclude that Eller’s actions are protected by absolute immunity with respect to Mother’s substantive due process claim. We emphasize, however, as we did in Ernst, that this holding does not insulate from liability all actions taken by child welfare caseworkers. See id. at 497 n. 7 (“[W]e would be unwilling to accord absolute immunity to investigative or administrative actions taken by child welfare workers outside the context of a judicial proceeding.” (citation and internal quotation marks omitted)). Investigations conducted outside of the context of judicial proceedings may still be susceptible to due process claims. Nor can caseworkers shield their investigatory work from review merely by seeking a court order at some point. See Buckley, 509 U.S. at 276, 113 S.Ct. 2606 (“[A] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because ... that work may be retrospectively described as ‘preparation’ .... ” (citation omitted)). The key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the caseworker occupies in carrying it out. See Schneyder, 653 F.3d at 332 (“The court must ascertain ... what conduct forms the basis for the plaintiffs cause of action, and ... then determine what function ... that act served.”). Here, Eller advocated on behalf of the County in the May 5 meeting and continued in that role through the June 23 custody determination. Because the underlying function of her actions throughout that judicial proceeding — including during the investigation and composition of the report — was fundamentally prosecutorial in nature, she is entitled to absolute immunity for this claim.
B. Due Process Claims Against the County
Having concluded that none of the claims against Eller and Barth are viable, we turn now to Mother’s due process claims against the County. Mother contends that the County violated her procedural due process rights by failing to afford her a prompt post-removal hearing after Daughter was removed from her cus *271 tody on May 5, 2006, and through Eller’s actions in meeting ex parte with Judge Cascio on June 23, 2006, and providing him with what Mother alleges is false information about her treatment of Daughter. She also argues that the County violated her substantive due process rights because Daughter’s removal was based on Eller’s “concoct[ed] facts” and “manipulate[ed] ... evidence.” (Appellant’s Opening Br. at 52.)
1. Failure to Provide a Postr-Removal Hearing
Due process is implicated when protected interests such as a parent’s liberty interest “in the custody, care and management of [his or her] children” are subjected to intrusion by the state. Croft, 103 F.3d at 1125. An individual must ordinarily be afforded “the opportunity to be heard ‘at a meaningful time and in a meaningful manner’ ” before any such intrusion. Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). The extent of that obligation is, as the Supreme Court has instructed, a flexible one, based upon a balance of several factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Id. at 335, 96 S.Ct. 893. Thus, when a parent complains of state action intruding on the “parent-child relationship,” the parent’s interest must “be balanced against the state’s interest in protecting children suspected of being abused.” Miller, 174 F.3d at 373. While the question of what constitutes due process is necessarily rooted in the circumstances of a given case, it is axiomatic that at least some process is required when a “state seeks to alter, terminate, or suspend a parent’s right to the custody of [her] minor children.” McCurdy v. Dodd, 352 F.3d 820, 827 (3d Cir.2003).
Mother, as noted, argues that her procedural due process rights were violated here because she was afforded no hearing when Daughter was removed through the County’s practice of transferring custody to another guardian. See supra Part I.C. Indeed, Mother’s first opportunity to protest her Daughter’s removal was when she appeared before Judge Cascio 40 days later in connection with the habeas corpus proceedings that she herself had initiated.
Adopting the arguments of the Appel-lees, the District Court concluded that Mother’s procedural due process rights were not violated. It reasoned that the May 5, 2006 order “did not terminate all parental custody rights” but instead “transferred primary custody from the Natural Mother to the Natural Father and provided for supervised visitation of the Natural Mother with the Minor Child.” (Joint App. at 36.) The Court further concluded that Mother was “receiving and has received due process” because she had the opportunity to schedule a hearing and because “[t]he period of forty-five days during which [the County] concluded its [abuse] investigation was not an overly lengthy deprivation of the Natural Mother’s status as primary custodian pending the completion of the investigation.” (Id. at 36-37.) WTiile the District Court was right to consider the degree to which the order intruded upon Mother’s rights in ascertaining what process was due under the circumstances, see Mathews, 424 U.S. *272 at 335, 96 S.Ct. 893 (instructing courts to consider “the private interest that will be affected by the official action”), we cannot agree with its conclusion that Mother received due process.
Even if Mathews’s flexible standard permitted less process here than in a case where the state takes custody of a child— and that is a question on which we express no opinion at this time — that would not mean that no hearing was needed to address the deprivation effected by the removal of Daughter from Mother’s custody. The deprivation of a parent’s custodial relationship with a child is among the most drastic actions that a state can take against an individual’s liberty interest, with profound ramifications for the integrity of the family unit and for each member of it. From the parent’s perspective, there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here. In either case, the government has implicated a fundamental liberty interest of the parent who loses custody. The state has caused a deprivation and risks having done so wrongly. See id. (noting “the risk of an erroneous deprivation” must be considered). Therefore, assuming the “fiscal and administrative burdens,” id., of affording such parents a prompt post-removal hearing do not outweigh the need for one — and it is hard to imagine when they would — such a hearing ought to be held.[30] Cf. Berman v. Young, 291 F.3d 976, 985 (7th Cir.2002) (“When the state removes a child from her parents, due process guarantees prompt and fair post-deprivation judicial review.” (emphasis added)).
It is no adequate response to say, as the District Court did and as the County continues to argue, that Mother was given an opportunity to be heard because she filed a habeas petition on her own and received a hearing in connection with that. Some courthouse somewhere may be open to someone aggressive and knowledgeable enough to initiate legal action, but that does not meet the state’s burden of providing an “opportunity to be heard at a meaningful time and in a meaningful manner” to a parent deprived of custody, Mathews, 424 U.S. at 333, 96 S.Ct. 893 (citation and internal quotation marks omitted), particularly when, as here, no notice was ever given as to how a hearing could be scheduled and the hearing occurred 40 days after Daughter’s removal.[31] Cf. Berman, 291 F.3d at 985 (referring to “prompt and fair post-deprivation judicial review”). Nor is it sufficient that Mother’s custodial rights were eventually addressed after El-ler’s abuse investigation was concluded. The constitutional deprivation at issue at this point is Daughter’s initial removal from Mother’s home, so being heard much later, after the deprivation, fails to address the harm.
Of course, “[t]he right to familial integrity ... does not include a right to remain free from child abuse investigations.” *273 Croft, 103 F.3d at 1125. However, in view of the extremely important liberty interests at stake here, due process required the County to offer Mother a chance to be promptly heard after they took Daughter from her home, regardless of whether or not state law independently imposed that obligation. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (the question of “what process is due” is a matter of constitutional law, not state law (citation and internal quotation marks)). And because there is no dispute about the historical fact that Mother was not offered the post-removal hearing to which she was constitutionally entitled, we agree with Mother that the District Court should have determined that the County violated her right to procedural due process.[32]
That, however, does not end our inquiry, because we must also determine whether that due process irregularity resulted in some damage. See Carey v. Piphus, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (holding that a plaintiff asserting a procedural due process claim under § 1983 must introduce proof of damages arising from the alleged due process violation in order to recover actual damages). The County argues that it did not, claiming that regardless of “the sufficiency of the process granted ... plaintiffs [cannot] demonstrate that such process would have borne a different result.” (Appellees’ Br. at 29.) Thus, the County says, the District Court appropriately entered judgment in its favor. That is mistaken.
If nothing else, the violation of Mother’s right to procedural due process would be a basis for awarding nominal damages. See Carey, 435 U.S. at 266, 98 S.Ct. 1042 (“[W]e believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.”); Simmons v. Uintah Health Care Special Dist., 506 F.3d 1281, 1286 (10th Cir.2007) (“Even when one does not prove any compensable damages from a due process violation, under Section 1983 a cause of action and nominal damages remain available.”). More importantly, however, there could be a finding of actual damages.
The County is blind to that prospect. It asks us to hold that no rational jury could conclude that a post-removal hearing would have made a difference, because, as the County sees it, no one could think the underlying facts are the least ambiguous: Mother was starving Daughter, and that’s that. But Daughter was weighed on May 5 and May 8, immediately after having been in Mother’s care, and those weights demonstrated a noteworthy improvement in her condition. For that very reason, Dr. Lindblad testified that he likely “would have waited until another opportunity to examine [Daughter] before calling the ChildLine,” if he had been aware of the May 5, 2006 weight of “22 pounds, 2 ounces.” (Joint App. at 369.) Another expert wondered why Daughter was removed, since she had shown meaningful improvement while in Mother’s then-recent custody. (See id. at 695 (“It is un *274 clear to me why the child was removed on a day when she showed significant weight gain for the first time while under the mother’s care.”).) Daughter’s May 5 and May 8 weights could have come to light if a post-removal hearing had been conducted,[33] and, given the significance of those weights, a reviewing judge may have ordered Daughter to be returned to Mother’s custody if the judge accepted Mother’s account of how the weigh-ins were conducted.[34] In short, it is not obvious that the custody determinations would have been the same, had the information regarding the May 5 and May 8 weights been fully aired.
The only remaining question, then, is whether the County is accountable to Mother for whatever damages a jury finds she sustained as a result of that constitutional violation.[35] With respect to municipalities such as the County, that inquiry turns on whether the due process violation was a result of the County’s “policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.” Monell v. Dep’t of Soc. Servs. of the City of N.Y., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A policy is a decision of a municipality’s “duly constituted legislative body” or of “officials whose acts may fairly be said to be those of the municipality.” Bd. of the Cnty. Comm’rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). A custom is a practice that, although “not ... formally approved by an appropriate decisionmaker ... is so widespread as to have the force of law.” Id. at 404, 117 S.Ct. 1382. “In either of these *275 cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom.” Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir.1990); see Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 193 (3d Cir.2009) (same).
Although the record does not support a conclusion that the County has a formal policy against providing hearings for parents such as Mother, the evidence does demonstrate, as the County essentially admits in its briefing (see Appellees’ Br. at 23 (referring to the County’s “Summary and Order procedure”)), that, amidst abuse allegations, the County has a custom of removing children from a parent’s home without conducting a prompt post-removal hearing if another parent can take custody. Hunt, the Assistant Director of Somerset County Children and Youth Services, testified that the procedure employed to remove Daughter from Mother’s custody without a hearing is utilized in circumstances in which there is a “fit-and-willing parent” to be “given the right by the court to care for the child.” (Joint App. at 330.) Douglas Walters, a caseworker supervisor at Somerset County Children and Youth Services, elaborated that the process is used several times each year, explaining that caseworkers at the agency would know they could “obtain an order to stop contact until [the agency] could investigate” in a case such as Mother’s (id. at 339-340), because they would be informed of that option “through discussions and meetings, ongoing meetings, ... with the[ir] supervisors,” (id. at 340).
Thus, while the relevant policymaker is not readily apparent,[36] the evidence shows conclusively that, when a noncustodial parent is available to take a child, it is customary for the County to temporarily suspend the other parent’s custody rights without a hearing, when abuse is suspected. That custom was utilized with official approbation in this case. And, because there is no question that what the County calls its “Summary and Order procedure” (Appellees’ Br. at 23) violated Mother’s right to a prompt post-removal hearing, we conclude that the County is liable under § 1983 for whatever damages a jury may deem appropriate to redress that violation. See Andrews, 895 F.2d at 1480 (stating that liability attaches “only when execution of a government’s policy or custom ... inflicts the injury” (citation omitted)).
2. Other Due Process Claims Against the County
We now briefly turn to Mother’s second procedural due process claim against the *276 County, which arises from Eller’s ex parte report of the child abuse investigation to Judge Cascio on June 23, 2006, and to her substantive due process claim. There is no evidence supporting § 1983 liability against the County for either claim. Mother does not allege that the June 23, 2006 meeting with Judge Cascio was made pursuant to any policy or custom. Lacking such evidence, we must conclude that the District Court was correct in holding that the County is not liable under § 1983 for any alleged constitutional harm arising from that meeting. See Monell, 436 U.S. at 694, 98 S.Ct. 2018 (“[I]t is when execution of a government’s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.”). Similarly, Mother’s substantive due process claim focuses entirely on Eller’s conduct, alleging that her “concoct[ion] [of] facts” and “manipulation of evidence” to effectuate Daughter’s removal was so egregious that it “shocks the conscience.” (Appellant’s Opening Br. at 52-53.) Because Mother provides no evidence that the County had a policy or custom endorsing such behavior, if it occurred, we agree with the District Court that the County is entitled to summary judgment on the substantive due process claim as well.
IV. Conclusion
For the foregoing reasons, we affirm in part and reverse in part the District Court’s order. We affirm the District Court’s order to the extent it awarded judgment in favor of Eller and Barth on the procedural due process claims; awarded judgment to all Appellees on the substantive due process claims; and awarded judgment to the County on the procedural due process claim as it relates to the June 23 meeting. We reverse the District Court’s denial of summary judgment to Appellant on her procedural due process claim against the County for its violation of her right to a post-removal hearing, and we remand this case for a trial on the damages associated with that violation.

. Although our standard of review directs us to view the facts in the light most favorable to the parly against whom summary judgment is sought, see infra Part II, we proceed at this point by reciting the undisputed facts.

. Failure to thrive is a diagnosis that may be “based upon an objective finding that a child’s weight falls below the third percentile of weight of children of like age.’’ (Appellant's Opening Br. at 15; see MedlinePlus Medical Encyclopedia, Failure to Thrive, http://www.nlm.nih.gov/medlineplus/ency/ article/000991.htm (last visited Nov. 6, 2012).)

. Munchausen by proxy “is a form of child abuse in which a parent induces real or apparent symptoms of a disease in a child.” MedlinePlus Medical Encyclopedia, Mun-chausen Syndrome by Proxy, http://www.nlm. nih. gov/medlineplus/ency/article/O01555 .htm (last visited Nov. 6, 2012).

. As detailed in Part I.C, infra, Pennsylvania provides a specific protocol for reporting and investigating child abuse. Under that statutory and regulatory framework, certain persons are required to report suspected abuse. See 23 Pa. Cons.Stat. Ann. § 6313(a) ("Reports from persons required to report ... shall be made immediately by telephone and in writing within 48 hours after the oral report.”). ChildLine is the state entity that accepts such calls. See Pennsylvania Department of Public Welfare, Child Line Abuse Registry, http:// www.dpw.state.pa.us/provider/childwelfare services/childlineandabuseregistry/index.htm (last visited Nov. 6, 2012) ("The Mission of ChildLine is to accept calls ... 24 hours per day, seven days per week .... The Intake Unit ... is available ... to receive reports of suspected child abuse.”).

. Appellees acknowledge that Somerset County Children and Youth Services acts on behalf of Somerset County with respect to child protective services (see Joint App. at 77 (stating that Somerset County Children and Youth Services "perform[s] certain functions as permitted under state law regarding the protection of children in Somerset County”)), and have treated the liability of those two entities as being coextensive throughout the litigation in this case. See, e.g., W.D. Pa. ECF no. 08-30, doc. no. 50, at 2; 12-15 (arguing that judgment should be entered "as to [Mother’s] claims against Somerset County and Somerset County CYS because there is no evidence of record of any unconstitutional custom, policy or practice,” and focusing exclusively on Somerset Children and Youth Services' conduct in developing that contention). We thus treat them as the same for purposes of our discussion and will generally refer to Somerset County and Somerset County Children and Youth Services collectively as "the County” throughout this opinion.

.Given the path this case has followed, there is some irony in how it began. The County was initially contacted by Mother, who reported in December 2005 that she believed Father was not properly feeding Daughter when Daughter stayed at Father's home. El-ler was assigned to the case, and met with Father in relation to her investigation. During that meeting, Father described the difference between Daughter's inpatient weight gain and her weight gain at home, which evidently prompted Eller to investigate whether Mother was being neglectful or abusive.

. The parties dispute whose report came first. Mother implies that Eller's ChildLine call was made on May 4, 2006 while Dr. Lindblad waited until May 5, 2006 to make his Child-Line call. Appellees, by contrast, state that Dr. Lindblad made his ChildLine report on the evening of May 4, 2006 whereas Eller's call was made on May 5, 2006. The difference is immaterial to our decision.

. The written summary of the ChildLine report did not, however, describe Dr. Lindblad's Munchausen by proxy concern or attribute the reported information to Dr. Lindblad.

. Notwithstanding the prior allegations that Mother lodged against Father, see supra note 6, Mother does not now contest that he was fit to be a custodial parent.

. When Dr. Lindblad examined Daughter on April 18, 2006, he recorded her weight as 9.2 kilograms, which is equivalent to 20.2 pounds. In late April, Daughter was weighed by two other physicians, and her weight was recorded as being between 20 pounds and 21 pounds.

. Aimed at ''encourag[ing] more complete reporting of suspected child abuse” and at protecting children from further abuse, 23 Pa. Cons.Stat. Ann. § 6302(b), the CPSL requires child abuse reports to be investigated and permits children to be taken into protective custody by the state, see id. § 6315. The statute provides, however, that any protective custody may not “be maintained longer than 72 hours without an informal [court] hearing” as provided in the Juvenile Act. Id. § 6315(d). Pennsylvania’s Juvenile Act requires an “informal hearing [to] be held promptly by the court or master and not later than 72 hours after the child is placed in detention or shelter care to determine whether his detention or shelter care is required.” 42 Pa. Cons.Stat. Ann. § 6332(a).

. In light of the CPSL’s requirements for follow-up hearings in cases in which protective custody is taken, we understand Walters to have been referring to orders stopping contact between the parent and the child in which the state does not take custody of the child.

. Although the record is not entirely clear, we understand the references to "Berlin Pediatrics” to be a shorthand for the Somerset Pediatric and Adolescent Health Center in Berlin, Pennsylvania. (See Joint App. at 710 (Daughter's "Berlin Pediatrics” growth chart with a stamp for the "Somerset Pediatric and Adolescent Health Center” in Berlin, Pennsylvania).) We will employ that shorthand throughout this opinion.

. Based on the results of those weigh-ins, a physician retained by Mother opined that Daughter should not have been removed from Mother on May 5, 2006. (See Joint App. at 695 ("It is unclear to me why the child was removed on a day when she showed significant weight gain for the first time while under the mother’s care.”).) Dr. Lindblad offered similar testimony, stating he would likely not have called ChildLine if he was aware of Daughter's May 5, 2006 weight. (See id. at 369 (Dr. Lindblad's testimony that he likely "would have waited until another opportunity to examine the child for weight before calling the ChildLine,” if he had been aware of the May 5 weight of "22 pounds, 2 ounces”).) As discussed in greater detail herein, the importance of Daughter’s May 5 and May 8 weights is contested because Appellees take the position that Daughter was, unlike on other occasions, wearing clothes when weighed. See infra note 34.

.Under Pennsylvania state law, Eller was required to send "one copy of” that report form, known as "CY-48,” to ChildLine "within 30 days of the receipt of an oral report of suspected abuse.” (Joint App. at 455; see 55 Pa.Code § 3490.67(a) (“The county agency shall send the Child Protective Service Investigation Report form (CY-48) to ChildLine within 30-calendar days of the receipt of the report of suspected child abuse.”).)

. Specifically, Eller’s report stated that "[sjince [Daughter’s] first weigh-in on May 16, 2006 [Daughter] has gained 481 grams of weight or on average of [sic] 18 grams of weight per day.” (Joint App. at 456.) Daughter’s May 16, 2006 weight of 20 pounds, 11 ounces is equivalent to 331 ounces or 9383.692 grams. Thus, Eller’s assertion that Daughter had gained 481 grams implied that she had initially weighed in at 8902.692 grams, which is equivalent to 19 pounds, 10.03 ounces.

. Eller wrote "dress” next to the May 5 and May 8 results on a copy of a growth chart prepared by Berlin Pediatrics. She stated in her deposition that she observed that Daughter’s clothes were not removed when Daughter was weighed on May 5, and that Father informed her that Daughter was dressed for the weigh-in that occurred on May 8. Daughter’s pediatrician stated in his deposition, however, that the "standard practice” at Berlin Pediatrics was to weigh children such as Daughter "without their clothes.” (Joint App. at 371.)

.Mother was ultimately advised by letter of the conclusion reached in Eller’s June 19, 2006 report. The letter advised that Mother had the right to request that the report be amended or destroyed if she believed it was inaccurate. She initiated proceedings to do that, but her request to expunge the report was denied. Although Mother had the opportunity to appeal that decision and she initially sought to do so, she ultimately withdrew her appeal.

. Mother’s complaint also pleaded a First Amendment claim and a civil conspiracy claim, which she has abandoned on appeal.

. Section 1983 permits a cause of action against ”[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States].42 U.S.C. § 1983.

. As discussed at greater length herein, liability under § 1983 "attaches to a municipality only when execution of a government’s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.” Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir.1990) (citation omitted); see Good v. Dauphin Cnty. Social Servs. For Children & Youth, 891 F.2d 1087, 1096 (3d Cir.1989) ("The defendants ... now argue that summary judgment should be affirmed on the ground that plaintiffs failed to state a cause of action against them under section 1983, because municipal liability cannot be based upon respondeat superior ....”).

. Unlike a qualified immunity analysis, which often involves an initial inquiry into whether the facts alleged show a violation of a constitutional right, see Pearson v. Callahan, 555 U.S. 223, 232-36, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (concluding that it is often appropriate, although not mandatory, for a court to first consider whether the facts alleged show a violation of a constitutional right before reaching the qualified immunity issue), the question of absolute immunity can be addressed as a threshold issue. See Mitchell v. Forsyth, 472 U.S. 511, 520, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (concluding first that the Attorney General was not entitled to absolute immunity for his conduct before turning to the question of whether a constitutional right had been violated).

. Appellees refer to this process as a "Summary and Order procedure.” (See, e.g., Ap-pellees' Br. at 23.)

. There is a "heads-I-win, tails-you-lose” quality to the Appellees’ assertion that, on the one hand, the lack of dependency proceedings means there was no obligation to afford Mother a prompt post-removal hearing, see supra Part I.C, while, on the other hand, the alleged similarity between the County’s Summary and Order procedure and dependency proceedings means that Eller and Barth should be absolutely immune. We reach our holding in spite of and not because of that somewhat inconsistent line of argument.

. The dissent contends that the absence of dependency proceedings requires that we deny absolute immunity. That, however, would unnecessarily convert what is a feature of some immunity cases into a prerequisite for immunity in all child welfare cases. Our focus should be, instead, on whether the function of the child welfare worker, while engaged in the challenged act, was prosecutorial. See Ernst, 108 F.3d at 495 (emphasizing the import of the function performed).

. We address the procedural due process claims against the County infra Part III.B. Here, for purposes of the absolute immunity determination, we address only those claims against Eller and Barth.

. Our dissenting colleague argues that there can be no absolute immunity for the procedural due process claims because the caseworkers lacked "statutory authorization to approach the judge to request” the orders. (Dissent at 277; see id. at 282 (discussing the second ex parte meeting).) That authorization was lacking, he claims, because the caseworkers “merely initiat[ed] a custody process between parents,” a process not included in the statutorily permitted circumstances under which caseworkers can seek a removal order. (Id. at 279.) It is certainly true that absolute immunity does not protect acts in a "complete and clear absence of authority.” Snell, 920 F.2d at 694. The question of whether an act can be so characterized, however, is assessed from the perspective of the objectively reasonable caseworker, "without reference to the official’s subjective state of mind.” Ernst, 108 F.3d at 502. We disagree with the sug-gestión in the dissent that the caseworkers here could not have reasonably believed their actions were in furtherance of their authority. In Ernst, we determined that the lawyer who had been removed from serving on the agency's behalf "did not act in a clear absence of authority” because she could have reasonably “concluded that she owed a duty to her client” under the circumstances. Id. at 504. So too here. There can be no question that it was proper for the caseworkers to endeavor to protect Daughter, see 55 Pa.Code § 3490.53(b) ("The county agency shall protect the safety of the subject child and other children in the home ... and shall provide or arrange appropriate services when necessary during the investigation period.”), and the purpose of both the May 5 and June 23 orders was to do just that. Even if Pennsylvania law requires that purpose to be effectuated by other means than the procedure undertaken here, it cannot be persuasively said that a reasonable caseworker would believe that she had acted "in a clear absence of authority” in procuring the May 5 and June 23 orders. Ernst, 108 F.3d at 504.

. Although Mother brings this claim against all of the Appellees, she fails to identify any action by Barth that amounts to a substantive due process violation, instead focusing entirely on Eller’s conduct. (See Appellant’s Opening Br. at 58 ("[A] jury could conclude that Eller was deliberately indifferent ... and ... acted in a grossly negligent manner.” (emphasis added)); id. at 61 ("[A] jury could find that Eller’s conduct shocks the conscience....” (emphasis added)).) We conclude, therefore, that Mother has waived any challenge to the District Court’s ruling that Barth is entitled to summary judgment on the substantive due process claim. See Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 202-03 (3d Cir.2004) ("We have held on numerous occasions that [a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court.” (alteration in original) (citation and internal quotation marks omitted)). We address the County’s substantive due process liability infra Part III.B, and thus address only Eller’s substantive due process liability here.

. We reach this issue with regard to this claim, unlike with the claim arising from El-ler's May 5 conduct, because Mother has a much stronger case that her substantive due process rights were violated by Eller’s subsequent actions. Eller's failure to mention the May 5 and May 8 weigh-ins in her report, combined with evidence in the record that she had a contentious relationship with Mother (see Joint App. at 310 (describing how Eller found Mother "very offensive from the beginning of [their] relationship'')), could potentially, upon further analysis, support a determination that a rational jury might conclude that her behavior shocked the conscience. Thus, we must address whether Eller's conduct is protected by absolute immunity.

. It seems plain that requiring a prompt post-removal hearing would not impose a substantial administrative or financial burden upon the government in this case, primarily because such a hearing is already required whenever a county agency petitions the court for a finding of dependency. See supra note 11 and accompanying text.

. Because it is uncontested that Appellees failed to initiate a post-removal hearing in this case, we need not, and do not, opine on the precise contours of the process that Mother was due. Speaking generally, however, it should be obvious that a hearing 40 days later is not sufficiently prompt. The delay should ordinarily be measured in hours or days, not weeks.

. Had the County acted pursuant to a "protective custody order,” rather than via an order transferring custody between parents, its failure to provide a prompt hearing may have also violated Pennsylvania law. See 42 Pa, Cons.Stat. Ann. § 6324(1) (permitting the state to take a child into custody pursuant to "a protective custody order removing a child from the home of the parent, guardian, or custodian” if the courts determines "that to allow the child to remain in the home is contrary to the welfare of the child”). As described above, see supra note 11, Pennsylvania law requires that an informal hearing be held if protective custody is maintained for longer than 72 hours. 23 Pa. Cons.Stat. Ann. § 6315(d). Here, however, the County never claimed to be taking Daughter into protective custody, and it transferred Daughter to Father's care well before 72 hours had elapsed.

. Appellees have not directed us to any evidence that the May 5 and May 8 weights were brought to Judge Cascio’s attention at the hearing on Mother’s habeas corpus petition, and we have found none in the appellate record. Even if the new weights were discussed at that hearing, we would not necessarily reject Mother's claim to damages, as the primary issue at that hearing was not whether Daughter's removal was appropriate but, rather, whether the state had an obligation to conduct a post-removal hearing under the CPSL, given that Daughter had not been taken into state custody.

. There are serious questions as to whether the May 5 and May 8 weights were valid results. Our dissenting colleague indicates that Daughter must have been clothed when she weighed in at 22 pounds, 2 ounces because Eller made that first-hand observation on May 5. {see Dissent at 281 (arguing that Daughter "was clothed during [the May 5] weigh-in”).) So do Appellees, relying on El-ler’s testimony that Daughter was clothed when she was weighed on May 5 and May 8. If a jury accepts that testimony, as the dissent does, it may find that Mother suffered no damages in connection with the procedural due process violation committed here. However, despite any suggestion to the contrary, that testimony is not uncontroverted; Daughter’s medical record from Berlin Pediatrics lists those weights, and the only indication that Daughter was clothed was added by Eller herself. See supra note 17. That Berlin Pediatrics recorded Daughter's weights as having increased is undisputed. Eller’s notation and testimony are disputed, however, as a physician from that practice testified that it was the "standard practice” to weigh a child such as Daughter "without ... clothes.” (Joint App. at 371.) Although that physician did not observe Daughter being weighed on May 5 or May 8, we disagree with the dissent’s implicit conclusion that the physician’s testimony about the way the clinic conducted weigh-ins could not be accepted by a rational jury and lead the jury to then question Eller's account of how the May 5 and May 8 weights were taken. (See Dissent at 281 (noting that the doctor "never challenged Eller's testimony that, in essence, his protocol was not followed on that occasion”).) We do not imply how this factual dispute ought to be resolved; we only note that the dispute exists.

.As discussed above, see supra Part III.A, we conclude that Eller and Barth are absolutely immune from liability relating to the failure to afford Mother a prompt post-removal hearing.

. "The question of who is a 'policymaker' is a question of state law,” to be addressed by a court, not a jury, in "determin[ing] which official has final, unreviewable discretion to make a decision or take an action.” Andrews, 895 F.2d at 1481. Here, the District Court never determined who the relevant policymaker was, since it simply determined that Mother’s constitutional rights were not violated. Although we think it likely that Hunt would qualify as a policymaker for Monell purposes, the record and briefing is not sufficient to enable us to definitively answer that question in the first instance. We need not direct the District Court to consider that issue afresh on remand, however, because while "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge,” Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), Appellees’ effective admission of a custom obviates any need to have a court "determine, by reference to local law, which ... officials had final policymaking authority,” Simmons v. City of Phila., 947 F.2d 1042, 1065 (3d Cir.1991) (Becker, J., concurring); cf. id. at 1089 n. 1 (Sloviter, J., concurring) ("I do agree ... with Judge Becker’s conclusion ... that the City waived its claim that plaintiff failed to identify the responsible [policymaker].... ”).