Amir A. ISBELL, Bergina Brickhouse Isbell, M.D., J.B., and A.I., Plaintiffs,

v.

Paul J. BELLINO, M.D., Thomas W. Wilson, M.D., Geisinger Medical Center, Craig Patterson, Rachel Wade, Julie Spencer, and Montour County, Defendants.

No. 4:12–CV–0043.

United States District Court, M.D. Pennsylvania.

Aug. 27, 2013.

Order Denying Stay Pending Appeal Oct. 28, 2013.

Mark D. Freeman, Mark D. Freeman, Esq., Media, PA, for Plaintiffs.

David L. Schwalm, Thomas, Thomas & Hafer, LLP, Harrisburg, PA, for Defendants.

## MEMORANDUM & ORDER

JOHN E. JONES III, District Judge.

Presently pending before the Court are the motion for summary judgment of

Plaintiffs Amir A. Isbell, Bergina Brickhouse Isbell, and their minor children J.B. and A.I. (doc. 53) and the motion for summary judgment of Defendants Craig Patterson, Rachel Wade, Julie Spencer, and Montour County (doc. 58), each of which has been fully briefed. After considered review of the submissions, we will grant in part and deny in part the said motions, as more fully set forth below.

## I. FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs Amir Isbell ("Mr. Isbell") and Plaintiff Bergina Brickhouse–Isbell, M.D. ("Mrs. Isbell") are husband and wife and are the natural parents of minor Plaintiff A.I. ("A.I."), born in 2009. Mrs. Isbell is also the natural parent of minor Plaintiff J.B. ("J.B."), born in 2002. (Doc. 55, ¶ 1). At all times relevant to this case, Defendants Rachel Wade and Julie Spencer were employed as caseworkers with Montour County Children & Youth Services ("CYS"), an agency of Defendant Montour County (the "County") and Defendant Craig Patterson was employed as the Executive Director for CYS. (Id. ¶¶ 5, 7–8).

On January 7, 2010, Mrs. Isbell brought A.I. to Geisinger Medical Center for what she perceived as increasing somnolence and dehydration. (Id. ¶ 9). After an examination, the doctors diagnosed A.I. with several rib fractures and head trauma; concerned that the trauma was non-accidental, medical center staff filed a report of suspected child abuse with CYS in the early morning hours of January 8, 2010. (Doc. 55, ¶ 12; doc. 59, ¶¶ 6–7). The report noted that "the child is in serious & critical condition due to concern for non-accidental trauma." (Doc. 59, ¶ 7). Defendant Rachel Wade, a caseworker then employed by CYS, was on call and received the report from Childline. (Id. ¶ 8–10; doc. 55, ¶ 12).

At approximately 5:30 a.m. on January 8, Defendant Wade met with Mr. and Mrs. Isbell and A.I. at the medical center but did not at that time discuss the possibility of altered custody arrangements, safety plans, or family plans. (Doc. 55, ¶ 14). Later, at approximately 3:00 p.m., Defendant Wade returned to the medical center and told the Isbells that "safety plans are standard procedure" when CYS receives a report of suspected child abuse; Defendant Wade then had Mr. and Mrs. Isbell and A.I.'s maternal grandmother sign a safety plan which prohibited either of the Isbells from having unsupervised contact with either A.I. or J.B. (Id. ¶¶ 22, 25–26). Consistent with CYS policy, if the Isbells did not agree to the terms of the safety plan modifying their custodial rights, CYS would file a petition with the juvenile court for emergency protective custody of A.I. (Id. ¶ 26). This safety plan remained in effect until A.I. was released from the hospital.

Also on January 8, 2010, CYS issued letters to Mr. and Mrs. Isbell which advised them of their rights with regard to the Childline report. The letters, which the Defendants contend satisfy the constitutional requirements of procedural due process, contained identical language, in pertinent part as follows:

> The Child Protective Services Law, (Acts 124, 136, 42, 33, 80, 151 and 10) and Department of Public Welfare Regulations require the County Children and Youth Agency to notify all subjects in a report of suspected child abuse about the existence of the report, their legal rights, the possible impact of a confirmed report on future employment and the social services available to protect children.

> A report of suspected child abuse concerning the above named child has been made to our agency and the Pennsylva-

nia Department of Public Welfare. Under the law, our agency must conduct an investigation to determine whether or not the child was abused. Also, we are required by law to report certain types of suspected abuse to the police.

According to the report (list the type of suspected abuse and the nature and extent of the allegations): It is alleged that [A.I.] was physically abused.

*You are named as alleged perpetrator.*

*You are not named as alleged perpetrator. (X)*

The agency is required to complete the investigation within 60 days after the report is received and determine if the report is "unfounded," "indicated," or "founded." An unfounded report is any report in which there is no evidence of child abuse as defined by the law. An indicated report is a report in which the County agency determines that the child was abused. A founded report is a report in which a court determines that the child was abused. You will be notified in writing of the results of the investigation.

As a subject of the report, you may receive a copy of the report by writing to this agency or the ChildLine and Abuse Registry ... The name of the person who made the report or any person who cooperated in the investigation may not be released except by the Secretary of Public Welfare upon written request....

If the report is determined to be unfounded, the report will be expunged in one year and 120 days from the date the report was received by the Department. However, if the investigation reveals that the child and family need social services provided by or arranged by our agency, records will be retained and indicate that the report of suspected child abuse was unfounded.

If the report is determined to be indicated, the information will be kept on file until the child reaches his/her 23rd birthday. The person responsible for the abuse may request that the report be amended or expunged if he or she feels the report is not accurate. Such requests must be made to the Secretary of Public Welfare within 45 days after being notified that the report is indicated.

If the case goes to Juvenile Court, you have the right to have an attorney, introduce evidence and cross-examine witnesses.

A person responsible for abuse in a founded report may not be employed in any child care service, public or private school or be a foster or adoptive parent within five (5) years of when the abuse was committed.

A person convicted of any of the crimes listed in Section 6344 of the CPSL may never be employed in any child care service, public or private school or be a foster or adoptive parent.

The goal of our agency is to protect children from harm and keep them in their own homes. To help parents and other care givers to keep children in their own homes, our agency provides or arranges for social services for the child and family.

(Doc. 58–3, Ex. 8–9).

On January 22, 2010, in anticipation of A.I.'s release from the hospital, a new safety plan, prepared by Defendant Patterson, was presented to Mr. and Mrs. Isbell by Defendant Wade; the new plan provided that Mr. Isbell must move out of the residence, prohibited any unsupervised contact between the Isbells and their children, and required that all of Mr. Isbell's contact with A.I. be supervised by CYS. (Doc. 55, ¶ 37). That safety plan again warned that noncompliance with CYS di-

rectives would result in CYS petitioning the court for custody of the children. (*Id.*). Prior to the Isbells signing the January 22 safety plan, it was discussed with and reviewed by their counsel. (Doc. 59, ¶ 19). Also on January 22, 2010, felony and misdemeanor criminal charges arising from this incident were filed against Mr. Isbell, who was arraigned on January 27, 2010. His bail was conditioned on total compliance with CYS guidelines and directives. (Doc. 55, ¶ 40).

On February 12, 2010, an indicated report of abuse was made with respect to Mr. Isbell. The indicated report was signed by Defendant Wade. (Doc. 58–3, Ex. 15; Doc. 55, ¶ 45). At some point thereafter, although the record is unclear as to the specific date, Defendant Spencer assumed responsibility for the Isbell case, inheriting it from Defendant Wade. (Doc. 59, ¶ 30). On February 16, 2010, the Isbells signed a new safety plan which permitted Mrs. Isbell to have unsupervised contact with her children but further restricted Mr. Isbell's contact, permitting only supervised visits which occurred at the CYS agency office. (*Id.* ¶ 47). On February 17, 2010, Defendant Spencer issued a letter to Mr. and Mrs. Isbell which indicated that she believed that the family would benefit from "ongoing General Protective Services (GPS)" in the area of "Parenting Needs;" the letter further indicated that "the decision to provide ongoing services ... may be appealed by the custodial parent or the primary person responsible for the care of your children" and that Defendant Spencer would reach out to the family to discuss implementation of the family service plan; the letter makes no reference to the safety plan. (Doc. 58–3, Ex. 18).

In early March of 2010, Defendant Spencer performed a home inspection and observed Mr. Isbell leaving the house to barbecue when Mrs. Isbell arrived home with the children. Mr. Isbell believed that because he was not "in" the home with the children, he was not in violation of the plan; as a result, on March 12, 2010, a new safety plan was prepared as a "clarification and an amendment" to the most recent plan, prohibiting Mr. Isbell from being within 100 yards of his son. (Doc. 55, ¶¶ 50–51). It is unclear from the record whether or not the Plaintiffs' attorney participated in drafting or reviewing the amendment.

On April 30, 2010, Defendants Spencer and Patterson met with Plaintiffs and their counsel, who wanted to discuss the progression of the case. (Doc. 55, ¶ 53; doc. 59, ¶¶ 34–35). At that meeting, Defendant Patterson approved a revised safety plan which the Plaintiffs signed, along with a "family service plan," at the direction of their counsel. (Doc. 55, ¶¶ 54–56; doc. 59, ¶ 36). Plaintiffs' counsel believed that the family had no choice but to agree to the safety plan and family service plan because Mr. Isbell's bail would be revoked if they did not comply with CYS. (Doc. 55, ¶ 56; doc. 59, ¶ 36). The family service plan, which the Defendants do not dispute is a separate document from the safety plan, was triggered by the referral regarding A.I.'s head injury and mandated a minimum of six (6) months of "family services." (Doc. 58–3, Ex. 19). The family service plan provides that: "Parents, guardians, custodians and children have the right to participate in the development of this plan; however, if you disagree with this plan, you are not required to sign and have the right to appeal." (*Id.* p. 1). The family service plan also contains a specific Notice of Right to Appeal, as follows:

> As a parent of a child receiving services from the Montour County Children and Youth
>
> You have the right to appeal:

* any determination made which results in a denial, reduction, discontinuance, suspension, termination of service; or
* the County Agency's failure to act upon a request for service with reasonable promptness.

A) If the Juvenile Court is involved with your case, you may ask the Court to schedule a hearing regarding you and your child(ren).

B) You have the right to appeal Children & Youth Services' determination to the State's Department of Public Welfare (DPW) [address omitted]. Parents have the right to be represented by an attorney or a spokesperson of his/her choice, during the appeal process or any Court proceeding regarding your child(ren).

(*Id.* p. 11). The notice further provides a contact number in the event the parents wish to be represented by a lawyer but cannot afford one, describes the process for filing a written appeal, and notes that "[d]uring the appeal process, the service plan, as signed by the Children & Youth caseworker, remains in effect." (*Id.*). The family service plan and the notice of rights do not contain any reference to the safety plan. (*Id.*).

On May 27, 2010, Defendant Patterson filed a dependency petition which alleged that Plaintiff A.I. was a child without parents able to care for him. (Doc. 55, ¶ 65; doc. 59, ¶ 41). A hearing was held on June 30, 2010, before Judge James of the Court of Common Pleas of Montour County, during which proceeding the Plaintiffs stipulated to an in-home dependency without prejudice or any admission of abuse conduct and at which time the Plaintiffs signed a revised voluntary safety plan.

(Doc. 55, ¶ 66, 67; doc. 59, ¶ 43–45). This was the first court proceeding at which the Plaintiffs had the opportunity to challenge the safety plan. (Doc. 55, ¶ 67). When the Plaintiffs and their children later moved to Lycoming County, Montour County CYS made a referral to Lycoming County CYS, and the Plaintiffs agreed to Lycoming County's visitation plan, which required compliance with the safety plan created by Montour County CYS. (Doc. 59, ¶ 50). On May 4, 2011, the Court of Common Pleas of Lycoming County dismissed the dependency petition after a dependency trial, concluding that Mrs. Isbell was a "ready, willing, and able" parental provider. (Doc. 55–34, p. 10). At that time and to the present, the criminal charges against Mr. Isbell remain pending in Montour County.

Plaintiffs commenced this Section 1983 action by filing an eight-count complaint (doc. 1) on January 6, 2012, alleging various due process violations arising out of the child abuse investigation and voluntary safety plan implemented by Defendants Patterson, Wade, and Spencer and a claim for municipal liability against the Defendant County.[1] The matter was verbally referred to Magistrate Judge J. Andrew Smyser on January 11, 2012. Thereafter, the Defendants moved to dismiss all claims against them. (Doc. 16). The motion was fully briefed, and on July 6, 2012, Judge Smyser issued a report and recommendation ("R & R") (doc. 30) which recommended that we grant the Defendants' motion to the extent it sought dismissal of Plaintiffs' substantive due process and intentional infliction of emotional distress claims but deny the motion to the extent it sought dismissal of the Plaintiffs' proce-

---

**1.** The complaint initially asserted claims against Defendants Paul J. Bellino, Thomas W. Wilson, and Geisinger Medical Center. Those Defendants have been dismissed from this action and the claims against them are irrelevant to our resolution of the instantly pending motions. "Defendants" herein refers only to Defendants Wade, Patterson, and Spencer and the Defendant County.

dural due process claims, including the claim for municipal liability against the Defendant County. (*Id.*).

On September 25, 2012, we issued a memorandum and order (doc. 40), —— F.Supp.2d ——, 2012 WL 9510121 (M.D.Pa.2012), which adopted the R & R in its entirety. Therein, we agreed with Judge Smyser that the Plaintiffs' complaint failed to state facts to support either their substantive due process claims or their intentional infliction of emotional distress claim and we thus dismissed those counts against all Defendants with prejudice on a finding that the Defendants were entitled to qualified immunity. (*Id.*). As to the procedural due process claims, however, we reached a different result, concluding that the Third Circuit's decision in *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123 (3d Cir.1997) put child services agencies on notice that a "policy of removing the suspected parent from the family home during the pendency of child abuse investigations absent any procedural safeguards raises a procedural due process issue." (Doc. 40, p. 16, —— F.Supp.2d at ——, 2012 WL 9510121 (quoting *Croft*, 103 F.3d at 1126 n. 3)). In doing so, we also relied on our own recent decision in *Starkey v. York County*, No. 1:11–cv–00981, Doc. 28, 2011 WL 11071762 (M.D.Pa. Sept. 21, 2011), which involved substantially similar facts to those presented by the case *sub judice*. The matter thus proceeded to discovery on the remaining claims.

With discovery now closed, on May 8, 2013, the Plaintiffs filed a motion for summary judgment (doc. 53) contemporaneously with a supporting brief (doc. 54) and statement of undisputed facts (doc. 55). On May 17, 2013, the Defendants also moved for summary judgment (doc. 58) as to the remaining claims and the same day filed their supporting brief (doc. 60) and statement of undisputed facts (doc. 59).

The cross motions have now been fully briefed (docs. 54, 60, 66, 67, 69, 71) and are ripe for this Court's disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248– 49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir.2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a sum-

mary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey,* 772 F.2d 1103, 1109–10 (3d Cir.1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *P.N. v. Clementon Bd. of Educ.,* 442 F.3d 848, 852 (3d Cir.2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw therefrom. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

## III. DISCUSSION

The remaining issue before this Court is a narrow but complex one: we are tasked to consider whether procedural protections were due to the Plaintiffs when the Defendants implemented a voluntary safety plan that removed Mr. Isbell from his family home for an extended period of time following a report of suspected child abuse, and, if the answer is in the affirmative, whether the requisite due process was provided. The individual Defendants move for summary judgment, asserting that they are entitled to qualified and/or absolute immunity and that such plans, because of their "voluntary" nature, do not require procedural protections in the first instance. They alternatively contend that even if safeguards were required, the Plaintiffs were provided ample opportunities to challenge the safety plan. In the same vein, the Defendant County asserts that the Plaintiffs' claim against it for municipal liability fails because procedural protections are not necessary when a "voluntary" plan is offered to the parents, precluding a finding that it is liable for failing to provide such safeguards.

The Plaintiffs also move for summary judgment, asserting that the record before the Court amply demonstrates that the Defendants failed to offer any pre- or post-deprivation notice of their rights in any of their dealings with the Plaintiffs, in complete violation of the Fourteenth Amendment. In doing so, the Plaintiffs rely almost exclusively on our decision in *Starkey v. York County,* No. 11–cv–981, Doc. 65, 2012 WL 9509712 (M.D.Pa. Dec. 20, 2012) (Jones, J.). The Defendants, in response, assert and emphasize a number of ancillary facts which they contend distinguish this matter from *Starkey* and warrant a different result. The most appropriate starting point for our analysis, then, is a discussion of our decision in *Starkey,* which we ultimately determine is virtually indistinguishable from this matter.

### A. *Starkey v. York County*

The facts before this Court in *Starkey* bear striking resemblance to the facts of record *sub judice:* parents took their minor child to the hospital where the father reported that the child had bumped his head; when medical examinations revealed injuries which could be consistent with child abuse, the hospital made reports of suspected child abuse to Childline, and the county family services agency became involved. An initial safety plan was implemented by the agency, which prohibited unsupervised contact with the children; thereafter, another plan was implemented which again barred unsupervised contact but also provided that the parents may not reside in the family home with their children. The parents were advised that the agency would seek emergency custody of the children if they did not agree to the terms of the plan. *See Starkey,* No. 11–cv–981, Doc. 65, pp. 5–7. Neither safety

plan advised the parents of their rights or contained a notice of any opportunity to appeal the terms or imposition of the plan. *Id.* at p. 8. Approximately two months after the minor plaintiff was taken to the hospital, the assigned social worker filed an "indicated" report of child abuse and also filed dependency petitions for both of the Starkey children. At subsequent hearings, the court ultimately terminated the safety plan and the indicated reports of abuse were expunged. *Id.* at 9–11.

The parties filed cross-motions for summary judgment, and the agency and social workers alleged, as the Defendants do here, that the Fourteenth Amendment does not require procedural protections when the county implements a safety plan because the plan is "voluntary" and thus not a deprivation imposed under color of state law. The defendants also argued that even if procedural due process concerns were implicated when safety plans are established, the parents were provided with ample notice of their rights throughout their dealings with the agency. The parents asserted that because safety plans by their nature alter and interfere with parents' rights to custody, care, and management of their children, procedural safeguards are required. Because there were no facts in dispute, the question before the Court was purely one of law: whether parents have a right to notice and an opportunity to be heard when a safety plan is implemented.

In concluding that due process concerns are triggered by safety plans, we emphasized the Third Circuit's admonition that procedural due process "requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right" to the care, custody, and management of his or her children. *Id.* at 22 (quoting *McCurdy v. Dodd,* 352 F.3d 820, 827 (3d Cir.2003)). We noted further that the Circuit, in a

case involving similar facts in the context of a substantive due process claim, expressly noted that "the policy of removing the suspected parent from the home during the pendency of child abuse investigations absent any procedural safeguards raises a procedural due process issue." *Id.* at 23 (quoting *Croft v. Westmoreland Cnty. Children & Youth Servs.,* 103 F.3d 1123 (3d Cir.1997)). The defendants in *Starkey* urged this court to instead adopt *Dupuy v. Samuels,* 465 F.3d 757 (7th Cir. 2006), a Seventh Circuit case which held that safety plans by their nature are voluntary and require no procedural safeguards. We noted, however, that the *Croft* panel expressly rejected that characterization, observing that "the threat that unless [the father] left his home, the state would take his [child] and place her in foster care was blatantly coercive." *Starkey,* No. 11–cv–981, Doc. 65, at 26 (quoting *Croft,* 103 F.3d at 1125 n. 1). Thus, with reliance on *Croft* and *McCurdy,* we rejected with the agency's contention that such plans are voluntary and held that the Fourteenth Amendment requires county agencies to establish procedural safeguards when ordering the removal of a parent from the family home. *Id.*

After finding that procedural protections were required, we reviewed the record to determine whether such protections had in fact been offered, ultimately rejecting the agency's argument that it had provided ample notice to the parents of their rights in connection with the plan. Without deciding what level of protection, specifically, is required by the Fourteenth Amendment, we noted that the record contained a dearth of evidence of *any* procedural safeguards. We found no merit in the agency's argument that letters related to the Childline report, which contained notices of the right to appeal the report and to counsel in the event of an appeal, were sufficient to establish due process, observ-

ing that those letters made no mention of the safety plan itself or the parents' rights in connection therewith and were limited to a discussion of the parents' rights in connection with the report of abuse. *Id.* at 27–29. Further, we observed that the safety plan itself was facially devoid of any notice of rights whatsoever. We thus found that the defendants were not entitled to qualified immunity and, indeed, the parents entitled to summary judgment because the defendants had entirely failed to offer *any* pre- or post-deprivation opportunities for the parents to challenge the alteration of their parental rights. *Id.* at 65.

In *Starkey,* we also concluded that the parents were entitled to summary judgment on their municipal liability claim pursuant to *Monell v. N.Y.C. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). While we acknowledged that municipal liability claims are often difficult to prove and cannot be premised on a theory of vicarious liability, we noted that the county steadfastly maintained that it does not train its employees with regard to procedural safeguards because such protections were not required in conjunction with safety plans. On that basis, we concluded that no reasonable jury could find that the county had appropriately trained its employees with regard to those requisite safeguards. We thus granted summary judgment to the parents as to the *Monell* claim, in addition to the individual liability claims, and placed the case on a trial term on the sole issue of damages, which had not been addressed by the parties in their summary judgment papers. *Starkey,* No. 11–cv–981, Doc. 65, at 27–29.

### B. The Case *Sub Judice*

The Defendants' arguments in their motion for summary judgment here largely mirror the arguments made by the county defendants in *Starkey:* they assert that they are entitled to qualified immunity be-

cause, first, there is no constitutional right to procedural protections in conjunction with safety plans; second, that even if such a right did exist, it was not violated because procedural protections were offered to the Isbells; and third, that the right to procedural protections was not clearly established to the individual Defendants. The Plaintiffs in their motion assert that *Starkey* supports a finding of liability against the individual and the municipal Defendants. We first consider whether, based on the law of this Circuit and the facts before the Court, the individual Defendants are entitled to qualified immunity as to the Plaintiffs' procedural due process claim.

### 1. Qualified Immunity

Earlier in this litigation, based on the well-pled allegations of the Plaintiffs' complaint, we held that the doctrine of qualified immunity cannot protect the individual Defendants if they failed to offer any procedural protections to the Isbells either before or after depriving them of their constitutional right to the care, custody, and management of their children. (Doc. 40, pp. 11, 16–17, —— F.Supp.2d at ——, ——–——, 2012 WL 9510121). Reasserting many arguments already rejected by this Court, the Defendants again contend that the record supports a finding of qualified immunity, and judgment in their favor, on the Plaintiffs' remaining claim. The Plaintiffs, citing our prior decision in this case and quoting at length from our analysis in *Starkey,* assert that the facts of the two cases are indistinguishable and compel like results. On the undisputed facts before the Court, we cannot but agree with the Plaintiffs.

 The doctrine of qualified immunity shields officials acting and sued in their individual capacities. *See Brandon v. Holt,* 469 U.S. 464, 471–73, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). A state actor

"sued in his individual capacity enjoys qualified immunity if his conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 254 (3d Cir. 1999) (*superseded on other grounds in P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir.2009)). We will first address the Defendants' argument that the right to procedural protections for safety plans is not a "clearly established. right" before considering whether there exist genuine issues of fact as to whether that right was violated.

### a. Clearly Established Right

At the motion to dismiss stage of this matter, the Defendants argued that there is no constitutional right to due process protections in conjunction with a safety plan and that a nonexistent right could thus not be clearly established for purposes of a qualified immunity analysis. Relying on *Croft*, we emphasized that more than a decade ago, the Third Circuit put the Defendants on notice that coercing parents to sign a safety plan under threat that the county will otherwise take emergency custody of their children raises procedural due process concerns. (Doc. 40, p. 16–17, —— F.Supp.2d at ——–——, 2012 WL 9510121 (citing *Croft*, 103 F.3d at 1125 n. 3)). In doing so, we also relied on our decision in *Starkey*, which, citing *Croft*, rejected the county's assertion that "no judicial determination existed [at the time the defendants acted] that the use of voluntary safety plans was a violation of constitutional rights under the circumstances of this case." *Starkey*, No. 1:11–cv–981, No. 65, at p. 22. Given the similarities between *Starkey* and the matter *sub judice*, our analysis there is instructive:

> " 'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir.2001). That is, there must be "sufficient precedent at the time of the action ... to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. It has long been established that the "procedural component of procedural due process ... requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right" to the care, custody and management of his children. *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir.2003) (emphasis added). However, the Supreme Court has often emphasized that our inquiry " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen*, 543 U.S. 194, 198 [125 S.Ct. 596, 160 L.Ed.2d 583] (2004). We thus must query not whether the particular facts of this case can be melded into some established general principle of due process precedent, but instead whether the particular action taken in this case has previously been declared unconstitutional. We conclude that it has.

As previously noted, more than ten years before the conduct at issue here occurred the Third Circuit decided *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123 (3d Cir. 1997), a substantive due process case involving strikingly similar facts to those before the Court today. While *Croft* addressed the substantive due process concerns raised when implementing a safety plan and removing a child or parent from a home without an objective and reasonable basis to do so, the Circuit also noted that "the policy of removing the suspected parent from the family home during the pendency of child abuse investigations absent any procedural safeguards raises a *procedural* due

process issue." *Id.* at 1125 n. 3. The Circuit chastised the defendants' characterization of a similar safety plan as a "voluntary" agreement where, in fact, the parents only "agree" to the terms of the plan under threat that they will otherwise lose custody of their child. *Id.* at 1125 n. 1. The Defendants offer no compelling argument with regard to *Croft* and instead simply ignore its existence, contending that "there are no cases which are on-point to the circumstances alleged in Plaintiffs' Complaint, and, quite frankly, none which are clearly analogous and support Plaintiff's [sic] claims." (Doc. 51, p. 21).

*Id.* at pp. 22–23. Further, it has long been established, and the Defendants do not deny, that the Fourteenth Amendment "requires rigorous adherence to procedural safeguards anytime the state seeks to *alter*, terminate, or suspend a parent's right" to the care, custody and management of his children. *McCurdy*, 352 F.3d at 827 (emphasis added); *also B.S. v. Somerset Cnty.*, 704 F.3d 250, 271 (3d Cir.2013) (emphasizing that "at least *some* process is required" when state alters familial rights). With the exception of their reliance on *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir.2006), the rationale of which we have already rejected both here and in *Starkey*, the Defendants offer no compelling reason for us to reject our earlier decisions, and we cannot independently conceive of any basis for doing so.[2] We thus conclude, as we have previously, that the right to procedural due process protections when a county agency seeks to re-move a parent from the family home is clearly established in this Circuit.

### b. Violation of Constitutional Right

Having reaffirmed that the right to due process when a parent is removed from the family home is a clearly established right protected by the Fourteenth Amendment, we must determine next whether the Plaintiffs have established—or, in the context of the Defendants' motion, failed to establish—a violation of that constitutional right. It is clear, from the record, that the Isbells' right to the care, custody, and management of their children was altered substantially for several months, and that fact is not contested by the parties.[3] Our inquiry, then, is whether any procedure for challenging that deprivation was offered by the Defendants, and if so, whether that the procedure satisfies the requirements of procedural due process. *See Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

■ In attempt to distinguish this matter from *Starkey*, the Defendants emphasize several facts which they believe constitute sufficient due process to satisfy *Croft*. Specifically, the Defendants assert that: (1) Plaintiffs "were advised of their rights during the investigation;" (2) that "the bail bond requirements for Plaintiff Amir Isbell required compliance with the safety plans," (3) that the "family service plan and safety plan signed on April 30, 2010 contained a Notice of Rights," and (4) that "Plaintiffs stipulated to the safety plan before the Court of Common Pleas after

---

**2.** As the defendants did in *Starkey*, the Defendants here quote at length from the Seventh Circuit's decision in *Dupuy* as support for their contention that safety plans are voluntary and not entitled to procedural due process protections. We again reject *Dupuy* and its holding as it is directly inconsistent with the Third Circuit's admonition in *Croft* that removing a parent from the family home without any opportunity to be heard raises procedural due process concerns.

**3.** While the Defendants contend that this alteration was voluntarily accepted by the Plaintiffs rather than imposed by the Defendants, they nonetheless apparently concede that there was in fact an alteration of the Plaintiffs' familial rights.

the dependency petition was filed." (Doc. 60, p. 5).[4] The Plaintiffs contend that these alleged distinctions are mere red herrings. We will address each of these points *seriatim.*

The Defendants first assert that the Plaintiffs were advised of their rights to counsel and to a hearing "as early as January 8, 2010, when [CYS] issued letters to them regarding the investigation under the Child Protective Services law." (Doc. 60, p. 9). Critically, however, the letters issued on January 8, 2010, pertained only to the parents' rights with respect to the Childline report of suspected child abuse and made no mention whatsoever of the safety plan which the parents were asked to sign on that date. Specifically, the letters advised only that the parents have the right to receive a copy of the report of child abuse, that the parents have the right to request that the report be expunged or amended if they believe the report is not correct, and that "[i]f the case goes to Juvenile Court, [the parents] have the right to have an attorney, introduce evidence and cross-examine witnesses." (Doc. 58–3, Ex. 8–9). The letters are devoid of any reference to the safety plan or the rights of the parents in connection therewith, and we thus reject the blanket contention that these letters provided the Plaintiffs' with ample notice of their rights in connection with the safety plan.

The Defendants also assert that on April 30, 2010, "Plaintiffs signed a Family Service Plan and Safety Plan that contained a Notice of Rights." (Doc. 60, p. 12). Importantly, as we have noted above, the safety plan and the family service plan are two different documents; the parties apparently do not dispute, however, that it was the safety plan, and not the family service plan, which required Mr. Isbell to remove himself from the family home throughout the pendency of the investigation. Critically, none of the Plaintiffs' claims stem from the terms of the family service plan or the circumstances surrounding the signing of said plan. For this reason, as we have concluded *supra* with respect to the Childline letters, we cannot agree with the Defendants that the family service plan provided any level of notice of procedural protections to the Plaintiffs with respect to the safety plan itself. *See, e.g., Billups v. Penn State,* No. 1:11–cv–1784, Doc. 58, p. 3, 2012 WL 13922946 (M.D.Pa. Apr. 23, 2012) (at motion to dismiss stage, rejecting contention that notice of rights contained in family service plan is dispositive of plaintiffs' due process claims where none of the plaintiffs' claims were derived from the terms of the family service plan but instead were based on separate safety plan).

Critically, it cannot be disputed that each of the several versions of safety plan signed by the Plaintiffs are facially and entirely devoid of any notice of the right to an attorney or to a hearing or of any other means by which the Plaintiffs' could challenge the deprivation of ·their parental rights, and the Defendants have not identified *any* procedure which was in fact in place to protect those rights. For those reasons, we find that there are no genuine factual disputes from which a reasonable juror could find that either the safety plan itself or any other document or correspondence provided by the Defendants adequately satisfied even the most relaxed procedural due process requirements.

The Defendants also contend that Plaintiff Amir Isbell had the opportunity to

---

4. The Defendants also contend that this case is different from *Starkey* because the "safety plans were agreed to by Plaintiffs and their counsel." Because we have rejected *supra* the Defendants' contention that safety plans are voluntary, we need not again address this argument.

challenge the safety plan through Pennsylvania Rule of Criminal Procedure 529, which permits criminal defendants to request modification of bail provisions by formal motion to the judge of the Court of Common Pleas presiding over the case. (Doc. 60, p. 12 (citing Pa. R. Crim. P. 529)). The Defendants contend that because the Plaintiffs' attorney chose not to move for modification of the Plaintiff's bail in the state criminal proceedings, the Plaintiffs in effect were provided due process protections but elected to waive them. (*Id.*). The Defendants cite no authority in support of their proposition that the state court presiding over Mr. Isbell's criminal proceeding had jurisdiction to overturn or modify the safety plan imposed by CYS or to conduct a hearing in order to determine whether the plan was appropriate and justified. Our independent research has revealed no authority to support this claim and, there being no indication in the law nor in logic that a court with criminal jurisdiction had the authority to override the CYS safety plan or conduct a hearing on its merits, we are compelled to reject this argument as well.

■ Finally, the Defendants assert that the Plaintiffs effectively waived their procedural due process claim at the dependency petition hearing ultimately held on June 30, 2010, where the Plaintiffs stipulated to a safety plan that was, for all practical purposes, identical to the plan initially imposed by the Defendants. They argue that if one fact distinguishes this matter from *Starkey* in a material way, it is this one, which they believe demonstrates that the Plaintiffs suffered no harm from any deprivation and failure of process. By contrast, in *Starkey,* the plaintiff parents benefitted substantially from their ultimate opportunity to be heard, when the presiding judge terminated the safety plan and dismissed the dependency petition. Here, rather than proceed with the dependency hearing, the Plaintiff parents, with the assistance of their attorney, chose to stipulate to an in-home dependency and a revised safety plan. The Defendants thus assert that because the Plaintiffs agreed to a safety plan even after they had an opportunity to be heard, no harm flowed from whatever procedural due process violation may have occurred in the interim five months. Specifically, they contend that "even if there were alleged due process violations on the part of Defendants, which Defendants deny, Plaintiffs' voluntary agreement to a substantially identical safety plan after their hearing before the Court evidences that an earlier hearing would not have produced a different result. In other words, the alleged due process violations did not cause any damage to the Plaintiffs." (Doc. 67, pp. 13–14).

■ The Third Circuit, however, has recently rejected this argument. In *B.S. v. Somerset County,* 704 F.3d 250 (3d Cir. 2013), the court rejected the defendants' contention that a due process claim fails unless the plaintiff can demonstrate that additional due process protections "would have borne a different result." *Id.* at 273. The court in *B.S.* held that an otherwise viable procedural due process claim does not fail merely by lack of actual damages, noting that "[i]f nothing else, the violation of [a parent's] right to procedural due process would be a basis for awarding nominal damages." *Id.* (quoting *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) ("We believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.")). Thus, a procedural due process violation, once established, entitles a plaintiff to, at minimum, nominal damages in recognition of the violation of his or her constitutional right, and we reject the Defendants' contention that the Plaintiffs' procedural due

process claim necessarily fails for lack of actual damages.

There is no question on the record before the Court that the Plaintiffs were mired in a legal limbo, obliged to follow the terms of the safety plan imposed by the Defendants without any means of recourse for nearly five months. There is further no dispute that the Plaintiffs were given no instruction as to how they might challenge the safety plan as a whole or any of its individual terms; indeed, regardless of the question of how, the Plaintiffs were not even told whether they had such a right. The record establishes unequivocally that the Plaintiffs were not offered a means by which to challenge the safety plan at all until the Defendants, at their sole election and within their sole discretion, elected to pursue dependency proceedings, triggering the hearing which finally offered the Plaintiffs a forum to address the safety plan before a court. Thus, even construing all of the evidence in the Defendants' favor, we are compelled to conclude that the Defendants entirely failed to provide any level of procedural due process protections to the Plaintiffs in any meaningful manner either pre- or post-deprivation.

As we have observed, the critical question is whether the county agency afforded any wit of process to the Plaintiffs before or after implementing the voluntary safety plan. Stripping away the multitude of ancillary facts emphasized by the Defendants, the simple answer is no. Indeed, once the record is boiled down to only those facts relevant to our due process analysis, it is pellucidly evident that there was utterly no process established by the agency for challenging either the implementation or the terms of a voluntary safety plan, rendering this case entirely indistinguishable from *Starkey* and directing us to a like result. Accordingly, given the undisputed record facts, and consistent with our decision in *Starkey* and the Circuit's admonition in *Croft*, we are obligated to deny the Defendants' request for summary judgment and indeed to grant the Plaintiffs' motion, finding that the record establishes a violation of the Plaintiffs' rights to procedural due process.

### 2. Defendant Wade

The Defendants assert that, regardless of our determinations above, in any event Defendant Wade cannot be subject to liability because her involvement in the proceedings terminated before the Plaintiffs suffered any deprivation of their parental rights. Specifically, while the Defendants concede that Defendant Wade participated in drafting and signed the initial safety plan on January 8, 2010, and further concede that Defendant Wade presented the January 22, 2010 safety plan to the Plaintiffs, securing their signatures and affixing her own, they assert that she "was not involved in preparing" the safety plans which removed Mr. Isbell from the family home and prohibited his unsupervised contact with the children and that she is thus too far removed from the constitutional transgression to be subject to Section 1983 liability. (Doc. 60, pp. 27–28). This argument, however, is entirely belied by the undisputed facts of record.

It is true, as the Defendants assert, that in order for a plaintiff to succeed on a Section 1983 claim against an individual defendant, the evidence must establish that the defendant was personally involved in the constitutional violation. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir.2010). Indeed, liability cannot be predicated on a theory of *respondeat superior* and the plaintiff must establish that the defendant "participated in violating the plaintiff's rights, directed others to violate them, or, [in the case of a] person in charge, had knowledge of and acquiesced in his subordinates' violations."

*Id.* Thus, in order for a defendant to be subject to Section 1983 liability, the plaintiff must establish that he or she participated in or encouraged the constitutional violation at issue. *Id.; see also Kretchmar v. Bachtle,* 2005 WL 1367412, *2, 2005 U.S. Dist. LEXIS 11136, *6–7 (E.D.Pa. June 6, 2005) ("Any defendant in a 42 U.S.C. § 1983 civil rights action must have personal involvement in the alleged wrongs.").

■■■ Turning to the record before the Court, it is undisputed that Defendant Wade participated in drafting and signed the initial safety plan of January 8, 2010, which mandated an open door policy with the Plaintiffs while minor Plaintiff A.I. was in the hospital and prohibited either parent from unsupervised contact with their child. (Doc. 59, ¶¶ 9–10). Defendant Wade also testified that while she did not draft the January 22, 2010 safety plan herself, she remained actively involved in the case until it was reassigned to Defendant Spencer; specifically, she indicated that she presented the January 22 plan to the Plaintiffs, secured their signatures, and signed the plan herself. (Id. ¶ 16–18; Doc. 65, ¶ 16). Indeed, far from being disputed, Defendant Wade concedes these facts in her deposition. (Doc. 55–37, at 20:15–23:4). The Defendants are correct, however, that the record reveals no further involvement by Defendant Wade after approximately January 25, 2010.

Regardless of Defendant Wade's truncated participation in this panoply, her argument here is without merit. The undisputed—and indeed, admitted—record facts establish that Defendant Wade participated in the proceedings against the Plaintiffs for nearly an entire month and was personally involved in both drafting the initial safety plan, which curtailed the Plaintiffs' parental rights by prohibiting unsupervised contact with their children, and securing the Plaintiffs' signatures on the second safety plan, which removed Mr. Isbell

from the family home and again prohibited any and all unsupervised contact. The Defendants' argument is in essence that Defendant Wade was not *as* involved as the other Defendants in altering the Plaintiffs' parental rights because she was not involved for the full duration of the deprivation; however, Defendants point to no case law, and our educated guess is that none exists, supporting the proposition that a Section 1983 defendant is immunized from liability simply because his or her involvement in the constitutional violation was of an established but lesser degree than other defendants. Accordingly, on the record before us, we cannot but conclude that the Plaintiffs have established, and the Defendants have failed to offer evidence to counter, that Defendant Wade "participated in violating the plaintiff's rights." *Santiago,* 629 F.3d at 129. We will thus deny the Defendants' motion to the extent it seeks judgment in favor of Defendant Wade for lack of personal involvement, as there can be no genuine dispute that Defendant Wade's involvement, however temporary by comparison to other individual Defendants, played a crucial role in initiating the constitutional violation at issue.

### 3. *Monell* Claim

Finally, in Count V of their complaint, Plaintiffs assert a claim pursuant to *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) against the Defendant County for an unconstitutional policy and practice of failing to provide procedural due process notices, and for failing to train employees with regard to voluntary safety plans. Plaintiffs contend that because there is no evidence that the Defendants ever considered or implemented procedural protections in conjunction with voluntary safety plans, and because we granted summary judgment on the parents' *Monell*

claim under similar circumstances in *Starkey*, they are entitled to summary judgment as to Count V. The Defendants assert that they are entitled to summary judgment as to the Plaintiffs' failure-to-train claim against the Defendant County because they did train their employees with respect to the use of voluntary safety plans. (Doc. 60, p. 14). We again are compelled to agree with the Plaintiffs.

■ In *Monell*, the Supreme Court established the standard for a Section 1983 claim for municipal liability and outlined stringent pleading requirements which must be met before a municipality can be held liable for the conduct of those in its employ. *See id.* at 691, 98 S.Ct. 2018. The Court held that local governing bodies can be subject to Section 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694–95, 98 S.Ct. 2018. Municipal liability can also be premised on a failure to train theory, where an established and pervasive failure to train employees is the cause of the plaintiff's constitutional deprivation. *See Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir.1999). In Count V, the Plaintiffs assert both municipal failure to train claims and unconstitutional custom or policy claims against the Defendants. We will address these claims *seriatim*.

The Plaintiffs first claim that the Defendants have failed to train their employees with respect to application of procedural safeguards when drafting and implementing voluntary safety plans and that but for this failure to train, Plaintiffs would not have suffered a constitutional deprivation. In *Starkey*, we articulated the applicable failure to train standard as follows:

> ... It is well established that a plaintiff must demonstrate deliberate indifference on the part of the municipality or

its officer in order to establish failure to train liability. Such deliberate indifference requires a showing that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice ...; and (3) the wrong choice by an employee will frequently cause a deprivation of constitutional rights." Typically, in the context of a failure to train claim, *Monell* and its progeny require some showing by the plaintiff that a specific, alternative training exists which would have reduced the risk of a constitutional violation.

*Starkey*, No. 1:11–cv–00981, Doc. 65, at 32–33 (quoting *Carter*, 181 F.3d at 357 (3d Cir.1999); *Robert S. v. City of Phila.*, 2000 WL 341565, *5, 2000 U.S. Dist. LEXIS 4020, *14–15 (E.D.Pa. Mar. 30, 2000)). There, we noted that the county had failed to implement any training whatsoever with regard to the necessity of procedural protections in the context of voluntary safety plans. *Id.* Given that *Croft* had put the municipal defendants on notice more than a decade previously that removing a parent from the home without procedural protections raises procedural due process concerns, we concluded that "the municipality's total failure to address *Croft*'s concerns and train employees regarding requisite procedural safeguards constitutes a deliberate indifference to the due process rights of parents like the plaintiffs" and granted summary judgment in favor of the plaintiffs on the *Monell* failure to train claim. *Id.* at 34.

■ Once again, the Defendants have failed to meaningfully distinguish this matter from *Starkey*. While the Defendants have directed the Court to substantial record evidence which details the various trainings offered to and completed by each of the individual Defendants in this case, including evidence that the agency

trained its employees with respect to the *use* of safety plans, there is a dearth of record evidence that any of the individual Defendants were trained with regard to the procedural due process concerns and protections triggered by those plans. The indisputable fact remains that there is no record evidence which establishes that CYS employees received any training regarding the due process considerations raised where a parent is removed from the home by way of a voluntary safety plan. This is logically true, because as we have already found, there were no procedural safeguards in place. Because the record reveals an absence of training designed to protect this constitutional right, "the reasonable inference is that *any* training with respect to the constitutional rights at issue, specifically the necessity of including procedural safeguards when implementing safety plans, would have alleviated or reduced to nothing the likelihood of a constitutional deprivation." *Id.* at 33–34. Accordingly, on the facts before us, we must but conclude that the Defendant County exhibited deliberate indifferent to the rights of the Plaintiffs, and indeed all parents, by failing to train its employees as to the procedural safeguards necessary when removing a parent from the family home. For that reason, we are compelled to grant the Plaintiffs' motion for summary judgment as to the *Monell* failure to train claim.

 Likewise, the Plaintiffs have established, and the Defendants have offered no evidence which reasonably disputes, that the Defendant County has maintained a custom of failing to implement procedural due process protections in voluntary safety plan cases. As we noted in *Starkey*, in order to succeed on a claim against a municipality for an unconstitutional custom or policy, a plaintiff must establish that the widespread execution of the government's policy, either formally or informally, caused the plaintiff's constitu-

tional injury. *Id.* at 34 (quoting *Robert S.*, 2000 WL 341565, at *5–6, 2000 U.S. Dist. LEXIS 4020 at *16). In other words, a plaintiff must establish that the county or municipality is "responsible for either enacting, implementing or widespreadly engaging in a practice which constitutes or causes a constitutional violation." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008). As the Third Circuit has explained, there must be sufficient evidence from which a jury could conclude that the municipality was the "moving force" behind the injury suffered by the plaintiff. *Thompson v. Wynnewood of Lower Merion Twp.*, 2012 WL 4033706, *8, 2012 U.S. Dist. LEXIS 130742, *26–27 (E.D.Pa. Sept. 13, 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The record before the Court contains the initial safety plan and each revised safety plan issued to the Plaintiffs in this case, and it cannot be disputed that not one of those plans contains any notice of a right to an attorney or an opportunity to be heard with respect to the safety plan's imposition or its terms. The record also contains standard issued correspondence to the Plaintiffs regarding the Childline report, but that letter is likewise devoid of any notice of rights in conjunction with the safety plan. Further, and in our view most critically, it is and has been the Defendants' position throughout this litigation that such notices are not contained in nor provided in conjunction with voluntary safety plans because those plans are "voluntary" and thus do not trigger Fourteenth Amendment concerns, in essence conceding that due process protections were not—and as a rule, are not—provided when safety plans are implemented. We rejected this argument in *Starkey*, and we reject it again today.

Where, as here, the record establishes that the County routinely fails to provide notice and an opportunity to be heard when removing a parent from the family home and depriving that parent of his or her parental rights, and indeed contends that such notices are not required, there can be no question that the County is thus "responsible for either enacting, implementing or widespreadly engaging in a practice which constitutes or causes a constitutional violation." *Phillips*, 515 F.3d at 233. For this reason, we will grant the Plaintiffs' motion for summary judgment, and deny the Defendants' motion, as to both *Monell* claims.

### 4. Damages

Lastly, we will address the issue of damages. The Defendants argue that a punitive damages award is not available against the County or Defendants Wade, Spencer, and Patterson to the extent they are sued in their official capacities and that the Plaintiffs have failed to produce evidence supporting such an award to the extent the Defendants are sued in their individual capacities. The Plaintiffs, in their responsive papers, concede that punitive damages cannot be recovered from municipal defendants in their official capacities or from the municipality itself. *See Newport v. Fact Concerts*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Accordingly, we will grant the Defendants' motion to the extent they seek dismissal of the Plaintiffs' punitive damages claims against the Defendant County and the individual Defendants in their official capacities.

The Defendants also assert that the record does not support a finding that the individual Defendants' actions were so malicious and wanton as to support an award for punitive damages

against them personally.[5] The Supreme Court has observed that "the purpose of punitive damages is to punish a defendant for his willful or malicious conduct and to deter others from similar behavior;" for that reason, "such damages are available only on a showing of the requisite intent." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 n. 9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Indeed, punitive damages will only be awarded where a plaintiff has established to the satisfaction of a jury that the defendant's conduct was either "motivated by evil motive or intent" or involved "reckless or callous indifference to the federally protected rights of others." *Feldman v. Phila. Housing Auth.*, 43 F.3d 823, 833 (3d Cir.1994) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Our review of the record reveals that it is devoid of any document, testimony, or other evidence which evinces the requisite malicious intent on the Defendants' part to support an award of punitive damages, and the Plaintiffs have failed to direct the Court to any evidence which might support their claim. For this reason, we will grant summary judgment to the Defendants as to the punitive damages issue.

With punitive damages unavailable and judgment as to liability having been determined *supra*, the only question remaining at this juncture is whether an award of compensatory damages is supported by the record. However, while both parties have moved for summary judgment *in toto*, neither party has put either evidence or argument before the Court on the issue of actual damages. Accordingly, there is insufficient evidence before the Court on the issue of damages at this juncture from which we could make an appropriate deter-

---

**5.** The Plaintiffs have not responded to this argument in their opposition papers. Rather than deeming the issued to be waived, in the interest of caution, we briefly address the merits of the punitive damages claim.

mination as to whether and what amount of compensatory damages should be awarded. We shall thus follow the same course previously charted in *Starkey* and set this matter for trial on the issue of damages alone.

## IV. CONCLUSION

This Court is not unsympathetic to the myriad challenges facing the nation's social workers daily, and we are in full agreement with the Defendants' contention that they are frequently required to make instant, difficult decisions, often under tense and stressful circumstances. We are likewise cognizant of the Hobson's choice forced on social workers in these situations, where the safety of a child or children must be balanced against the constitutional rights of parents. Our decision today does not, as Defendants apparently fear, tip the scales in favor of the parents over the safety of the child. Indeed, to be clear, we do not hold that any level of due process is required *prior* to the deprivation attendant to a safety plan; our holding, as it was in *Starkey,* is simply that once a safety plan is implemented, a parent is entitled to some level of procedural protection in order to challenge the alteration of their parental rights, and that such opportunities must be provided in a meaningful and timely manner after the deprivation. Because the undisputed facts before the Court establish that the Defendants entirely failed to offer *any* pre- or post-deprivation protections to the Plaintiffs in connection with the safety plan, it is appropriate to enter summary judgment in the Plaintiffs' favor on the procedural due process claims.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Defendants' Motion for Summary Judgment (doc. 58) is **GRANTED** to the limited extent that it seeks a determination that punitive damages are unavailable against the individual Defendants in both their personal and their official capacities and further that such damages are unavailable against the Defendant County. The Motion is **DENIED** in all other respects.

2. The Plaintiffs' Motion for Summary Judgment (doc. 53) is **GRANTED** as to liability on the remaining procedural due process claims against the individual Defendants in both their personal and official capacities and the Defendant County, and judgment is **ENTERED** in favor of the Plaintiffs and against each Defendant named in Counts V and VI.

3. With judgment as to liability having been entered on all remaining Counts, this matter shall proceed to trial on the limited issue of damages. A telephonic conference call **IS SCHEDULED** for October 29, 2013 at 10:15 a.m. for the purpose of discussing whether damages discovery is necessary and to chart a course for pretrial proceedings. Counsel for the Plaintiffs **SHALL** initiate the said call to Chambers at (717) 221–3986. At the time the call is placed, all counsel shall be on the line and prepared to proceed.

## MEMORANDUM & ORDER

On August 27, 2013, this Court issued a memorandum and order (Doc. 72), relevantly granting Plaintiffs' motion for summary judgment on their procedural due process claim. Defendants timely filed a Motion for Certification of Interlocutory Appeal and Stay Pending Appeal (Doc. 73), seeking immediate review of the order. For the reasons articulated herein, the Court will deny the Motion.

## I. Background

Plaintiffs commenced the underlying action by filing a complaint (Doc. 1) assert-

ing, *inter alia*, that Defendants' implementation of a voluntary safety plan, based on a report of suspected child abuse, violated their procedural due process rights. The safety plan had pertinently required Plaintiff Amir Isbell to vacate the family home for a period of time and prohibited unsupervised contact between the Isbells and their children. Plaintiffs received no notice of the right to an attorney or a hearing or any other means of challenging the deprivation of their parental rights resulting from the application of the safety plan.

After several procedural turns, Plaintiffs relevantly moved for summary judgment as to the due process claim, which this Court granted. *See* 962 F.Supp.2d 738. We rejected Defendants' qualified immunity defense, holding that the right to procedural protections is clearly established where a county agency endeavors to remove a parent from the family home. *See id.* at 748–50. We explained that the Third Circuit, in *Croft v. Westmoreland County Children and Youth Services,* 103 F.3d 1123 (3d Cir.1996), noted that "the policy of removing the suspected parent from the family home during the pendency of child abuse investigations absent any procedural safeguards raises a procedural due process issue," *id.* at 1125 n. 3, and that "rigorous adherence to procedural safeguards" is necessary anytime a state seeks to alter or suspend a parent's right to the custody of his or her children. *McCurdy v. Dodd,* 352 F.3d 820, 827 (3d Cir.2003); *see generally Starkey v. York Cnty.,* No. 11–cv–981, slip op. (M.D.Pa. Dec. 20, 2012). We additionally found that Mr. and Mrs. Isbell's right to the care and custody of their children was substantially altered by the safety plan and that neither the safety plan nor any other correspondence from Defendants met "even the most relaxed procedural due process requirements." 962 F.Supp.2d at 751. We imposed judgment as to liability in Plain-

tiff's favor and ordered a trial on damages only.

Defendants filed the present motion for certification of interlocutory appeal and stay pending appeal on September 6, 2013 (Doc. 73), as well as a supporting brief (Doc. 74). Plaintiffs filed an opposition brief on September 13, 2013 (Doc. 75), and, on September 27, 2013, Defendants filed a reply (Doc. 76). The motion is now fully briefed and ripe for disposition.

## II. Discussion

Interlocutory review was intended by Congress for only "exceptional cases." *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 74, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996) (citation and internal quotation marks omitted); *see also Couch v. Telescope Inc.,* 611 F.3d 629, 633 (9th Cir.2010) (explaining that 28 U.S.C. § 1292(b) provides a "narrow exception to the final judgment rule"). A district court may certify an order for interlocutory appeal where (1) the relevant order involves a "controlling question of law"; (2) there is "substantial ground for difference of opinion" on that question; and (3) a prompt appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Katz v. Carte Blanche Corp.,* 496 F.2d 747, 754 (3d Cir.1974). The burden is on the moving party to demonstrate that each requirement is satisfied. *See Orson, Inc. v. Miramax Film Corp.,* 867 F.Supp. 319, 321 (E.D.Pa.1994) (citation omitted). Even if the statutory conditions are met, the Court may exercise its discretion to decline to certify the order. *See In re Chocolate Confectionary Antitrust Litigation,* 607 F.Supp.2d 701, 704 (M.D.Pa.2009) (citations omitted).

Defendants assert that there are two controlling questions in this case: whether *Croft* clearly establishes the right to procedural protections as to a voluntary

safety plan, and, also, what minimal procedural due process is necessary when implementing a voluntary safety plan. Defendants argue that, if it is ultimately held that the right to procedural due process has not been clearly established, then they are entitled to qualified immunity and summary judgment should not have been granted in Plaintiffs' favor. Defendants also assert that there is no authority as to what procedural safeguards are necessary when a safety plan is implemented, maintaining that they provided minimal procedural protections, for instance, by advising Plaintiffs of their rights related to the child abuse investigation and obtaining the agreement of Plaintiffs and their counsel to the safety plan. Contending that substantial grounds for differing opinions exist on these issues, Defendants explain that *Croft* does not control because it concerned substantive—not procedural—due process and is factually distinguishable. Even assuming procedural safeguards are necessary, Defendants aver that no Third Circuit precedent addresses what would constitute minimal due process. Finally, Defendants argue that an immediate appeal could obviate the need for a trial on damages.

After considering the law and the parties' arguments, we conclude that Defendants have failed to demonstrate the existence of substantial grounds for a difference of opinion on a controlling question of law. First, what constitutes minimum due process relative to a voluntary safety plan is not a controlling question in this case because the Court found that Defendants failed to provide any process whatsoever. *See* 962 F.Supp.2d at 753 ("[W]e are compelled to conclude that the Defendants entirely failed to provide any level of procedural due process protections to the Plaintiffs in any meaningful manner either pre- or post-deprivation."). Thus, the disposition of this legal issue does not control the outcome of this matter. *See Katz,* 496 F.2d at 755 (explaining that a controlling question of law is one that "would result in a reversal of a judgment after final hearing").

Second, Defendants have not demonstrated substantial grounds for differing opinions as to the right to procedural safeguards where the state implements a voluntary safety plan. It is an established principal that where a state endeavors to change or affect the parent-child relationship in furtherance of a legitimate state interest, Fourteenth Amendment liberty interests are implicated, requiring procedural safeguards. *See, e.g., B.S. v. Somerset Cnty.,* 704 F.3d 250, 271 (3d Cir.2013) ("[I]t is axiomatic that at least some process is required when a 'state seeks to alter, terminate, or suspend a parent's right to the custody of [her] minor children.'" (quoting *McCurdy,* 352 F.3d at 827)); *McCurdy,* 352 F.3d at 827 (compelling "rigorous adherence to procedural safeguards" where parents' custodial relationship with their children is interfered with by the state (citing *Stanley v. Illinois,* 405 U.S. 645, 656–57, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972))). Fundamentally, due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)), and, here, as stated, this Court found that Plaintiffs had no such opportunity. Accordingly, we find that Defendants have not demonstrated that "controlling authority fails to resolve a pivotal matter" in this case, *In re Chocolate Confectionary Antitrust Litigation,* 607 F.Supp.2d at 705, and we conclude that interlocutory appeal is not appropriate.

As we decline to grant Defendants' motion for certification, it is unnecessary to address the motion to stay litigation.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT Defendants' Motion for Certification of Interlocutory Appeal and Stay Pending Appeal (Doc. 73) is **DENIED.**